IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| FREDDIE FOUNTAIN | § | |
| VS. | § | CIVIL ACTION NO. 6:15cv100 |
| JOHN A. RUPERT, ET. AL. | § | |

<u>REPORT AND RECOMMENDATION OF</u>
<u>THE UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff Freddie Fountain, a former inmate of the Texas Department of Criminal Justice proceeding *pro se* and *in forma pauperis*, filed this civil rights lawsuit under 28 U.S.C. § 1983, complaining of alleged deprivations of his constitutional rights stemming from his incarceration inside the Coffield Unit. The Court reopened this case following the United States Court of Appeals for the Fifth Circuit's adjudication of his appeal—which affirmed the dismissal of some claims while remanding others. *See Fountain v. Rupert*, 819 F. App'x 215 (5th Cir. 2020).

Following the remand, Plaintiff Fountain moved to stay his case. The Court granted the motion and administratively closed his case until Plaintiff informed the Court of his desire to proceed. Plaintiff's case was subsequently reopened, and the Court issued a scheduling order—directing the Defendants to address all remaining claims in accordance with the Fifth Circuit's opinion, (Dkt. #189).

Now before the Court is Defendants' motion for summary judgment, (Dkt. #251), and Plaintiff's responses in opposition, (Dkt. ## 292, 301), along with his individual attachments totaling approximately 4,200 exhibits and over 10,500 pages of documents. The parties have submitted over 12,000 pages of documents. For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted and the remaining claims in this lawsuit be dismissed with prejudice.

1

**II. Fountain's Remaining Claims Before the Court**

Fountain's operative pleading is his amended complaint after several amendments, (Dkt. #95). The remaining claims in this lawsuit concern only those remanded by the Fifth Circuit. Those include his Eighth Amendment claims regarding: (1) excessive temperatures, both hot and cold, (2) extreme shower water temperatures and the "mutual enforcing effect" of depriving him basic hygiene, (3) sleep deprivation and excessive noise, (4) adequate nutrition and weight loss, (5) long-term placement in restrictive housing (administrative segregation), (6) unsanitary prison and cell conditions, (7) indigent mail and access to courts, and (8) the mental and physical injuries related to the totality of his confinement. *Fountain*, 819 F. App'x at 218-20.

1. Excessive Temperatures—Both Hot and Cold

In this claim, Fountain alleges that Defendants Richardson, Rupert, Coleman, Livingston, and Collier subjected him to extreme indoor temperatures from 2011 through 2017 by either directing or allowing cell conditions consisting of freezing air from 20 degrees to 40 degrees Fahrenheit and blowing rain. He maintains that Defendants "did so each winter by deliberately not turning the cell block heaters on" while also "allowing open, screenless, broken, and missing glass windows directly across and in close proximity to [his] cell" and turning the "summertime exhaust ventilation system" on at night and day—which pulled the cold air inside, (Dkt. #95, pg. 12). Fountain asserts that these conditions threatened his life with risks of hypothermia and pneumonia and precluded his ability to undress for showers. He also notes that the cold weather caused two ear injuries in 2014. *Id.*

Moreover, Fountain asserts that Defendants subjected him to "extremely high, dangerous, cruel and harmful inner cell temperatures" during the summer months between 2011 and 2016. *Id.* at pg. 13. He insists that Defendants "callously and maliciously refused to even attempt to protect

[him] in any way from the dangers of such high inner cell temperatures" by deliberately failing to provide cold showers, cool fluids, or air conditioning, (Dkt. #95, pg. 13).

### 2. Extreme Shower Temperatures and Basic Hygiene

Fountain asserts that Defendants Rupert, Richardson, and Coleman directed/allowed all administrative segregation officers "to go into the pipe chase and physically adjust the shower water temperatures to either [straight] ice cold or boiling hot on a continual year round basis," which was intended to "force" him to refrain from showering "nearly year round for six years to date." *Id*. at pg. 11. He insists that such practice threatened him with high risk of hypothermia and pneumonia when the water was cold—and, when hot, the water would burn him resulting in "hundreds to thousands of burns" to his body. *Id*. Fountain identifies two dates, November 20, 2013 and March 11, 2015, when he allegedly sustained burns.

### 3. Sleep Deprivation and Excessive Noise

Fountain states that Defendants "employed the technique of having [his] wing officers routine approach him at such times as 3-5 o'clock in the morning for his only available shower" even though they knew he "had not enough sleep"—causing him to refuse a shower. *Id*. at pg. 11.

Fountain further maintains that the Defendants imposed "psychological stresses" upon him by deliberately robbing him of sleep. Specifically, he claims that Defendants allowed "cell block officers to conduct basic operations around the clock 24 hours a day," and that prisoners would kick steel doors, bang shields, yell, and scream. His sleep was precluded altogether during the day because vast operations would occur on the prison "all day up until the late hours of each night," (Dkt. #95, pg. 21). Fountain explains that identification checks would occur at 10 to 10:30 pm nightly, then laundry pick-up at 11pm-12am, then the serving of caffeinated coffee at 3-4 am, then breakfast and laundry return at 3-4am, and then showers began at 3-4am routinely all year. *Id*.

Such schedule "intentionally precluded vital sleep for years, and harmed [him] physically"—which included thoughts and attempts of suicide. *Id*.

### 4. Inadequate Nutrition

Fountain avers that from 2011 through 2017, prison officials starved him and failed to provide sufficient nutrients at each meal. Defendants Rupert, Richardson, Coleman, and Urbina falsified prison meal records to show that meats, vegetables, fruits, and nutrients were provided at each meal when they never were. *Id*. at pg. 17. For example, Fountain claims that only 1-3 ounces of sides (or none) were actually given despite documentation indicating that 4 ounces were provided. *Id*. Defendants only provided "half the daily caloric intake," intentionally malnourishing him; officials took "away proteins and other needed higher quality nutrients, and replace[d], if any, with very poor quality and lower nutrient based foods all year." *Id*. at pg. 18. When the medical department would order "more food" to be provided to him, Defendants routinely would not comply—causing his "hip and rib bones [to] protrude," weight loss, and severe agony.

### 5. Long-Term Placement in Administrative Segregation

Fountain alleges that for six years, Defendants "Rupert and Richardson maliciously held [him] in an unlawfully small 5x9 sensory deprivation chamber (ad-seg cell)" nearly 24-hours per day for over six years, (Dkt. #95, pg. 8). He notes that he had no access to direct sunlight, books or reading material, a television, running hot water, or a desk/writing surface. Fountain insists that he had "no room" to walk around and no meaningful form of human contact—all of which was intended to cause him psychological harm. *Id*. He also states that he was held in a small, filthy, dark cell—where a lightbulb was denied—for "a few weeks to as long as 50 consecutive days at a time" over the course of the six years in question. *Id*. at pg. 21.

6. Unsanitary Prison and Cell Conditions in Administrative Segregation

Fountain insists that Defendants Rupert, Richardson, and Coleman maliciously conspired with other segregation officers to create an overall, year-round condition of "extreme health and life endangerment" by subjecting him to "heightened levels of disease, virus and bacterial exposure." *Id.* at pg. 8. Specifically, he notes that his cell was full of harmful bacteria and viruses. Toilets were lined with scum and a stench; unknown substances, blood, urine, feces, pepper spray, and more were visible on the floors, walls, and toiletries of his cell. *Id.* at pg. 9. Insects would rot and run all over the cell runs. Defendants witnessed these conditions for years, but "never cleaned or sterilized his cell nor gave him cleaning tools and adequate chemicals to do so himself." *Id.* Defendants, he insists, promoted insect infestations throughout all the buildings in his cell—and on his person—denying him the basic need of safe and sanitary conditions, (Dkt. #95, pg. 9).

7. Indigent Mail Policy

Fountain argues that from 2013 to 2017, Defendants Livingston and Collier restricted his speech with his two daughters by implementing and allowing TDCJ Policy BP-03.91, which overly restricted supplies and postage to only five, one-ounce letters per week. He claims that his daughters needed his letters, and mail was the only way to contact them—as he was unable to mail them drawings, which harmed their relationship. *Id.* at pg. 25.

8. Injuries

Fountain states that the totality of the conditions and claims from 2014 through 2017 caused him depression, anger, hopelessness, loss of happiness and inner peace, and severe long-term mental and emotional pain and suffering. *Id.* at pg. 8. Describing the conditions of his confinement as "torture," Fountain explains he also suffered from anxiety, thoughts of suicide, anxiety, and antisocial behavior.

### III. Defendants' Motion for Summary Judgment

Defendants filed a motion for summary judgment, (Dkt. #251). They argue that (1) Fountain lacks standing because he has shown no actual or imminent injury; (2) most of his claims are barred by the statute of limitations; and (3) Fountain's claims fail on the merits. Defendants attached several exhibits in support of their motion:

**Exhibit A: Affidavit of Michael Neil, Major at the Coffield Unit,**

**Exhibit B: Affidavit of Harold Gates, Food Service Program Supervisor, with relevant food service records,**

**Exhibit C: Affidavit of Garth Parker, Regional Director, with Coffield Unit's building schedule**

**Exhibit D: Affidavit of Tommy Pharis, Maintenance Supervisor at Coffield Unit, with photographs of the pipechase, restrictive housing showers, and shower temperature regulator,**

**Exhibit E: Affidavit of John Werner, Deputy Director of Support Operations, with relevant classification and disciplinary records,**

**Exhibit F: Fountains relevant medical records dated January 2011 through February 2017,**

**Exhibit G: Relevant Emergency Action Center reports,**

**Exhibit H: Fountain's relevant grievance records from January 2011 through February 2017,**

**Exhibit I: Relevant revisions of TDCJ's Heat Stress Policies,**

**Exhibit J: Relevant revisions of BP-03.91, Indigent Mail Policy,**

**Exhibit K: Fountains relevant commissary records,**

**Exhibit L: Relevant revisions of AD-3.40, "Out of cell time for general population offenders,"**

**Exhibit M: Relevant revisions of AD-04.68,**

**Exhibit N: Fountain's indigent supplies records,**

**Exhibit O: Relevant revisions of AD-07.33,**

**Exhibit P: Relevant revisions of AD-08.50, and**

**Exhibit Q: Affidavit of Jeania Pegoda, Program Manager for Access to Courts**.

## IV. Fountain's Responses

Foutain urges the Court to reject Defendants' motion for summary judgment because the Defendants "failed to meet their burden of proof as to any claim, their pleadings do not support a ruling in their favor, and they are not entitled to a judgment as a matter of law," (Dkt. #291, pg. 1). He states that he objects to the Defendants version of the facts. *Id*. at pg. 4.

In his supplemental response, (Dkt. #301), Fountain argues that his evidence shows that "all" of the disciplinary cases he received between 2011 and 2018 "were either completely false or invalid altogether," as the only valid case concerned possession of an extra towel. Because all the other disciplinary cases were invalid, he contends that he "was not the danger or security risk that Defendants claim, at all." (Dkt. #301, pg. 5). Defendants, therefore, "cannot show why they could not have prompted a unit transfer of [him] away from the Coffield unit in 2011-12, and placed him in general population or safe keeping in and around equally yoked low-risk non-dangerous inmates, instead of having forced him into long term isolation." *Id*.

## V. Summary Judgment Evidence

Both parties submitted a substantial amount of summary judgment evidence, totaling thousands of pages. Much of Fountain's proposed summary judgment evidence consists of records submitted by the Defendants—with his handwritten notes on the documents—as well as handwritten drawings, charts, and excerpts of supposed conversations. While the Court includes Fountain's handwritten notes in the outline of the evidence submitted in this case, his handwritten notes do not constitute competent summary judgment evidence.

A. *Extreme Shower Temperatures and Basic Hygiene*

Defendants provide a supported 2021 affidavit of Tommy Pharis, Maintenance Supervisor of the Coffield Unit, (Dkt. #251-6). Pharis explains that restrictive housing, also known as administrative segregation, has showers on each wing of the unit and "shower temperatures are set using the same mechanism that controls all potable hot water distribution, a thermostatically controlled mixing valve." *Id*. at pg. 197. The valve has an adjustment handle that "sets a desired water temperature and will then automatically adjust itself based on changes to incoming cold and hot water supplies." *Id*. The device can maintain a consistent water temperature and is located within the maintenance areas called "pipe chases" or mechanical rooms. *Id*. TDCJ policies provide that "operating temperatures shall be maintained according to manufacturer's requirements." *Id*.

Moreover, to reduce the potential for growth of bacteria, the "minimum set points for domestic hot water supply boilers" is maintained at 140 degrees Fahrenheit. He also notes that "hot water shall be tempered to provide 105 degrees – 108 degrees for sink, lavatories, and showers." *Id*. at pg. 198. If a prisoner complains about the water temperature, prison staff may adjust the temperature in the pipe chase, and a plumber technician will investigate. Defendants further provide photographs of a pipe chase, the valve, a sink, and a shower.

The summary judgment evidence reveals that Fountain alleged to prison officials that he suffered burns from the water in the showers on November 20, 2013, and March 11, 2015. Fountain's medical records from November 20, 2013, show that Fountain arrived at the Medical Department at the Coffield Unit as a walk-in at approximately 1435, complaining of burns, (Dkt. #254-1, pg. #275-76). Fountain explained that "the water in the shower was too hot and burned" him, occurring at 0815. Medical staff remarked that Fountain's chest area was red and had a large

8

blister on his right upper chest, as well as a "smaller blister along the sternum area." *Id*. at pg. 277. He also "had red areas to his right arm." *Id*. Staff applied silver sulfadiazine to the areas.

Prison officials conducted an emergency investigation of Fountain's claims, (Dkt. #254-2, pg. 461). Security staff interviewed Fountain, who explained that he when he turned the shower on, he was "blasted with scalding hot water." Officer Thomas was also interviewed, stating that "he put offender Fountain in the 3-Row shower at approximately 0800 hours" and at 0815, he removed Fountain from the shower and placed him inside his cell. *Id*. at pg. 463. Thomas noted that "offender Fountain did not complain about being burned or the shower being to[o] hot" and that "no other offenders on 3 Row complained about the shower being to[o] hot or having any burn marks." *Id*. He explained that he did not observe Fountain with burn marks upon removing him from the shower. A member of the maintenance staff, as well as a "risk manager," checked the water temperature at the valve the following day; the water temperature was 75 degrees when they first arrived. They then turned the water on and ran it for fifteen minutes—resulting in a temperature of 109 degrees, which was "within guidelines for winter weather." *Id*.

Defendants' summary judgment evidence further shows that Fountain complained of burns again on March 11, 2015. Arriving to the Medical Department on March 12, 2015, Fountain stated that "the shower head broke and the water burned me," (Dkt. #254-1, pg. 228). Staff noted that they observed "various sized red areas to bilat forearms and X2 blisters approx 1CM," and applied Silvadene. *Id*. Prison officials launched an investigation, and a cause was never identified.

Fountain points to his exhibit, 1513A, as evidence. Exhibit 1513A consists of his handwritten daily logs dated January 2015 through March 2021—supported by sworn and unsworn declarations. He also submits another handwritten daily log, Dkt. #281-7, Exhibit 20177A, wherein

he journals—beginning January 1, 2015, through May 13, 2021—answers to several questions posed to himself, a portion of which appears as follows:

| DATE | Was seg shower operations run today? | Time when daily shower was first offered | Frigid indoor air temp. at time shower offered? | High indoor heat and/or humidity at time of offer? | Did I go to shower? | Forced to attempt sleep instead of shower? | Was shower water temp. ice cold? | Was shower water temp. scalding hot? | Did I receive burns in desperate attempt to clean myself? | Did I actually receive a shower? | Second time at which daily shower was offered? | Did I go to shower? | Did I actually receive a shower? | Did I receive burns while attempting to clean myself? | Was officer present to open food slot for access? | Did officer know the water was too cold or too hot? | Did other inmates around me refuse their shower as well? | Time lapse since I last received an actual shower? HR / MIN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/1/15 | Yes | | Yes | | No* | | Yes | | | No | None | | No | | | Yes | Yes | |
| 12/2/15 | NR | | | | | | | | | NR | None | | No | | | | | |
| 12/3/15 | NR | | | | | | | | | NR | None | | No | | | | | |
| 12/4/15 | NR | | | | | | | | | NR | None | | No | | | | | |
| 12/5/15 | Yes | | | | No* | | Yes | | | No | None | | No | | | Yes | Yes | |

Dkt. #281-7. Fountain also presents his prison grievances concerning the water temperature, a handwritten drawing of the cell run/pipe chase/shower stall, and a declaration that Defendants' photographs of the valve, the shower, and pipe chase "were taken by TDCJ staf[f] who set the temperature to the proper setting for purposes of this image only," (Dkt. #283, Exhibit 4124A).

*B. Sleep Deprivation*

Defendants provide an affidavit from Garth Parker, Region II Director of TDCJ, concerning the Coffield Unit's 24-hour Building Schedule and a written copy of the schedule, (Dkt. #251-5, pg. 189-195). Fountain points to his medical records relating to his stress and anxiety levels. Specifically, he supplies his medical records wherein he complained of the inability to sleep. *See* Exhibit 4123A. For example, he highlights a September 9, 2015, mental health record where he complained of "lack of sleep—related to noise of other offender around him on the unit," (Dkt. #283-17, pg. 25-29).

In an unnumbered Step 1 grievance, within his Exhibit 4123A, Fountain complained that the noise within the administrative segregation cells were disrupting his sleep. He stated that prison staff were intentionally preventing him from sleeping "every night" through "increased operations

and environmental noise" within administrative segregation. *Id*. at pg. 138. Specifically, Fountain complained that officers (1) were "keeping the volume turned up loud on their walky talkys"; (2) serving breakfast at 3:15 AM; and (3) conducting counts at 1:00 AM by waking prisoners up and making them verbally recite their inmate numbers. He stated that a nurse would "come through" at 5:30 AM hollering "sick calls," and then an officer would approach them at 7:00 AM to see if they would like showers. Sleep is then forgone at that point—as the officer begins running showers and lay-ins. *Id*. at pg. 139. In that grievance, Fountain asked prison officials to cease "all noise and operations" within administrative segregation from 10:00 PM to 7:00 or 8:00 AM and to place him inside a "sound resistant seg cell." *Id*.

### C. Food and Nutrition

Defendants provide an April 2021 affidavit from Harold Gates, TDCJ Program Supervisor V, regarding the Coffield Unit's food service department, dietary options, and dietary policies, (Dkt. #251-4, pg. 56-58) (Exhibit B). They also submit Fountain's litany of prison grievances regarding the food stemming from September 2011 through 2017, (Dkt. #259; #260; #261; #262) (Exhibit H, part 3). They also provide Fountain's commissary records from September 2016 through October 2020, (Dkt. #255-3) (Exhibit K).

Plaintiff submits the United States Department of Agriculture's (USDA) food pyramid, the TDCJ policy manual concerning meals with his handwritten notations, TDCJ cook worksheets, his written calculations of food calorie content, and handwritten daily food logs/calendars from May 2015 through May 2021, (Dkt. #280) (Exhibit 1512A). He also submits his TDCJ medical records to demonstrate his weight loss, particularly through writing "false" throughout the document.

### D. Extreme Temperatures—Hot and Cold

With respect to hot temperatures, Defendants present Fountain's medical records, which they contend do not include heat-related injuries and do not reflect that Fountain is heat sensitive. Defendants also provide an April 2021 affidavit from Michael McNeil, Major at the Coffield Unit, concerning the Coffield Unit's heat and cold weather mitigation strategies. Defendants further submit evidence regarding the Coffield Unit's heating and cooling system(s).

Plaintiff submits his medical records, highlighting his use of prescription medications that allegedly increase the likelihood of heat-related illnesses. He also cites his grievances, particularly related to an August 14, 2013, emergency room visit, (Dkt. #277-6) (Exhibit 131A).

### E. Restrictive Housing/Administrative Segregation—Duration and Conditions

Defendants submit an April 2021 affidavit from John Werner, TDCJ's Deputy Director of Support Operations, as well as supporting attachments, (Dkt. ##252-53; #266-270) (Exhibit E). Werner includes a chronological chart concerning Fountain's placement in administrative segregation—dated from January 2011 through December 2020. Defendants provide Fountain's TDCJ classification records, restriction records, records of offender protection investigations, disciplinary records, and activity records. (Exhibit E). Finally, Defendants submit Fountain's mental health records, (Dkt. #254-1) (Exhibit F).

Plaintiff provides many of the same prison records—particularly classification records— submitted by Defendants, with handwritten notes affixed to the documents. He also submits his medical and grievance records. *See* Dkt. #276.

### F. Indigent Mail and Access to Courts

Defendants submit BP 03.91 (rev. 3), TDCJ's indigent mail policies. They also highlight Fountain's many indigent supply request forms, (Exhibit N), prison grievances, (Exhibit H), and

12

disciplinary history, (Exhibit E). Jeania Pegoda, TDCJ Program Manager I—Access to Courts, provides an April 2021 affidavit addressing TDCJ's policies concerning mailing prison drawings, (Dkt. #256-5) (Exhibit Q).

Plaintiff points to his I-60s, (Exhibit 596A), submitted Step 1 and Step 2 grievances, the denial of his grievances (Exhibit 1502A), and disciplinary records, (Exhibit 4088A).

### G. Totality of Circumstances and Injuries

Both parties point to evidence submitted. Plaintiff cites his mental health records and evidence of the conditions of his confinement; he also submits numerous medical records concerning medical visits after his release from imprisonment.

## VI. Legal Standards

A court shall grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  In determining whether there is a genuine dispute of a material fact, the court must examine the evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.  *See S.E.C. v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1994). Summary judgment is appropriate "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted). "Material facts are those that might affect the outcome of the suit under the governing law." *Crostley v. Lamar Cnty., Tex.*, 717 F.3d 410, 422 (5th Cir. 2019) (internal citation and quotations omitted).

The Fifth Circuit has held that summary judgment disposition is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions.  *See Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987).  It is not the function of

the trial judge—in ruling on a motion for summary judgment—to weigh the evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence. *Id*. at 567 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

If the movant satisfies its initial burden of demonstrating the absence of a material fact dispute, then the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact dispute concerning the essential elements of its case for which it will bear the burden of proof at trial. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). The non-movant cannot survive a motion for summary judgment by resting on the allegations in his pleadings. *Isquith v. Middle South Util., Inc.*, 847 F.2d 186, 199 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988).

The Court is not required to scour the record for factual issues that might support a pro se litigant's position. *Perez v. Johnson*, 122 F.3d 1067, 1067 (5th Cir. 1997); *Ragas v. TN Gas Pipeline, Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."). In this vein, the non-movant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324; *see also Baughman v. Seale*, 761 F. App'x 371, 378 n.9 (5th Cir. 2019) ("The court construes pro se briefs liberally, though a litigant's pro se status does not relieve him of the procedural obligation to present evidence creating a genuine issue of material fact to survive summary judgment.").

To carry this burden, the non-movant must submit competent summary judgment evidence sufficient to defeat a properly supported motion for summary judgment. *See, e.g., Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 589-90 (5th Cir. 2004); *Domino v. Texas Dep't of*

*Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). All reasonable inferences are drawn in favor of the non-moving party, but the non-moving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only "a scintilla of evidence."" *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007); *Miller v. Graham*, 447 F. App'x 549, 551 (5th Cir. 2011); *Chacon v. York*, 434 F. App'x 330, 332 (5th Cir. 2011). "Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation" will not survive summary judgment. *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016). Rather, the non-movant "must point to specific evidence in the record demonstrating a material fact issue" at the summary judgment stage. *See Mitchell v. Mills*, 895 F.3d 365, 270 (5th Cir. 2018). The non-movant cannot rest upon mere allegations or "denials of the adverse party's pleading." *See U.S. v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001).

When qualified immunity is invoked, as is here, "only evidence—not argument, not facts in the complaint—will satisfy" the burden of proof necessary to defeat summary judgment. *See Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994) (internal citation omitted). Once the movant asserts immunity, the burden then shifts to the plaintiff to rebut it with more than conclusory allegations, unsubstantiated assertions, or speculation. *See Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003); *see also Miller v. Graham*,447 F. App'x 549, 551 (5th Cir. 2011) ("Miller has not overcome Graham's assertion of qualified immunity because he presented nothing but conclusory allegations and unsubstantiated assertions to assert his claim").

**V. Discussion and Analysis**

A review of the parties' summary judgment evidence viewed in the light most favorable to Fountain, shows that the evidence before the Court could not lead to different factual findings and conclusions. In other words, summary judgment is appropriate in this case because Fountain not

15

only failed to rebut Defendants' assertion of qualified immunity, but his claims also fail on the merits. Fountain failed to identify a constitutional violation.

### 1. Competent Summary Judgment Evidence

As an initial matter, the Court notes that much of Fountain's submissions are not proper summary judgment evidence. Evidence produced in connection with a summary judgment motion must also be admissible at trial. *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1024 (5th Cir. 1995); *Nolen v. Corinthian Colleges, Inc.*, 2009 WL 10700095, at *6 (W.D. Tex. Mar. 26, 2009). While admissible evidence may be submitted in an inadmissible form at the summary judgment stage, the proposed evidence must ultimately be admissible at trial. *See Donalson v. McLeaish*, No. 22-40757 (5th Cir. Dec. 18, 2023). Affidavits must be based on personal knowledge and admissible facts; portions of an affidavit that are conclusory, contain inadmissible hearsay, or are not based on the affiant's personal knowledge may be stricken. *Id.*; *see also* Fed. R. Civ. P. 56(e).

Evidence consisting of hearsay, general conclusions, and speculation is not competent summary judgment evidence. *See Okoye v. Univ. of Tex. Houston Health Sci. Center*, 245 F.3d 507, 510 n.5 (5th Cir. 2001) ("Because these statements are hearsay, they are not competent summary judgment evidence."); *see also Walker v. SBC Servs., Inc.*, 375 F. Supp.2d 524, 535 (N.D. Tex. 2005) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence."). The Federal Rules of Evidence define hearsay as a statement that "the declarant does not make while testifying at the current trial or hearing" that "a party offers in evidence to prove the truth of the matter asserted in the statement." *Smith v. Palafox*, 728 F. App'x 270, 276 (5th Cir. 2018) (citing FRE 801(c)).

Here, Fountain's summary judgment evidence consists of thousands of pages of handwritten charts, logs, calendars, drawings, and notations. Fountain relies heavily on his

handwritten notations affixed on Defendants' summary judgment evidence to refute the contents

of Defendants' evidence. For example, the record includes his handwritten notes on medical

records submitted by Defendants—as evidenced by the black and bold Bates Numbers at the

bottom of the document:



Dkt. #285-2, pg. id. #7949.



Dkt. #285-2, pg. id. #7977. While Fountain's sworn pleadings, personal charts, logs, and calendars

are competent summary judgment evidence because they in part stem from his personal

observations, his handwritten notations and comments—such as "False," "medical emergency," "I

did not say this," "I did not refuse," "these were their games," for example—superimposed onto Defendants' submitted evidence are not.

Fountain's handwritten notations within Defendants' submissions are self-serving assertions and hearsay for which there is no exception. *See Allen v. Fusion Autoplex LLC*, 2017 WL 1215431, at *2 (S.D. Tex. Mar. 31, 2017) ("Defendant argues that the handwritten time records are inadmissible hearsay. The court agrees."). While Fountain submits all of his "evidence" under penalty of perjury, for example, the "business record affidavits" cover the medical records themselves—not his handwritten notes. There is no evidence that Fountain was the custodian of his medical records, as it appears that he was not the original creator of the record. FRE 803(6)(A).

Moreover, Fountain provides no evidence that his handwritten additions on Defendants' evidence were created contemporaneously with the records. His notes are not dated. Similarly, Fountain provides no evidence that his handwritten notes were kept in the usual course of business or regular practice. FRE 803(6)(B); *see U.S. v. Commodity Futures Trading Com'n. v. Dizona*, 594 F.3d 408, 417 (5th Cir. 2010) (explaining that "for the [handwritten] notes to be admissible under Rule 803(6), the government also had to establish that it was regular course of that business activity to have the notes made.").

Ultimately, Fountain's handwritten notations superimposed on Defendants' summary judgment evidentiary submissions are inadmissible and therefore do not constitute competent summary judgment evidence. The Court will not consider them. *See Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995); *Washington v. Tyson Foods, Inc.*, 2018 WL 3603092, at *2 (E.D. Tex. June 27, 2018) ("As for the Call Log, although the accompanying declaration establishes the requirements of Federal Rules of Evidence Rule 803(6) for the Call Log, the handwritten notes in the Call Log are inadmissible hearsay."); *Alvarez v. San Antonio Citation Serv. Center*, 2009 WL

10669627, at * 3 (W.D. Tex. July 21, 2009); *see also Walker v. SBC Servs., Inc.*, 375 F. Supp.2d 524, 535 (N.D. Tex. 2005) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.").

       2. Fountain's Conditions of Confinement & Deliberate Indifference Claims

       Turning to the merits of Fountain's claims, the Court will first address his assertions regarding the conditions of his confinement at the Coffield Unit. The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. CONST. AMEND. VIII. The Supreme Court has repeatedly stressed that the Constitution does not mandate comfortable prisons and conditions that are "restrictive or even harsh … are part of the penalty that criminal offenders pay for their offenses against society." *Id*. at 347. Eighth Amendment protections "may afford protection against conditions of confinement which constitute health threats but not against those which cause mere discomfort or inconvenience." *Wilson v. Lynaugh*, 878 F.2d 846, 849 (5th Cir. 1989).

       While prisoners should not expect a rose garden when they enter the prison gate, prison officials must provide humane conditions—ensuring that prisoners receive adequate food, clothing, shelter, and medical care. Prison officials must also take reasonable measures to ensure prisoner safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *see also Hudson v. McMillian*, 503 U.S. 1, 8-10 (1992) (holding that conditions that result in unquestioned and serious deprivations of basic human needs violate the Eighth Amendment).

       The United States Court of Appeal for the Fifth Circuit has held that indicia of confinement constituting cruel and unusual punishment includes the wanton and unnecessary infliction of pain, conditions grossly disproportionate to the severity of the crime warranting imprisonment, and the deprivation of the minimal civilized measures of life's necessities. *See Wilson*, 878 F.2d at 848.

To sustain a claim that conditions of confinement violate the Eighth Amendment, a prisoner must meet an objective and a subjective standard. When viewed objectively, the conditions must be serious enough to "deprive [a prisoner] of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Conditions that "cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*.; *see also Alberti v. Klevenhagen*, 790 F.2d 1220, 1223 (5th Cir. 1986) ("Jail conditions must not fall below a minimum standard of decency required by the Eighth Amendment.").

Under the subjective component, the officials must act with a sufficiently culpable state of mind. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1981). A prison official may be held liable, nonetheless, only if he "ha[s] a sufficiently culpable state of mind," which, in context of prison conditions, is one of deliberate indifference to a prisoner's health and/or safety. *Torres*, 972 F.3d at 662 (quoting *Farmer*, 511 U.S. at 834). Deliberate indifference is an extremely high standard to meet: A prison official acts with deliberate indifference only if he (1) knows that the prisoner faces a substantial risk of serious bodily harm and (2) disregards that risk by failing to take reasonable measures to abate it. *Id*. at 663. In other words, a "deliberately indifferent state of mind requires that the official knows of an disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Williams v. Banks*, 956 F.3d 808, 811 (5th Cir. 2020). Negligence and even gross negligence will not suffice. *Torres*, 972 F.3d at 663.

### a. Shower Temperatures and Basic Hygiene

Fountain first maintains that Defendants Rupert, Richardson, and Coleman maliciously directed and/or allowed officers to "go into pipe chase and physically adjust the shower water temperatures to either [straight] ice cold or boiling hot on a continual year[-]round basis," (Dkt.

#95) (amended complaint). These "techniques" forced him to "have to" refuse a shower for six years. *Id.* Fountain claims he suffered "hundreds to thousands" of serious burns over six years—and that "his health and life were severely threatened with high risks of hypothermia and pneumonia." *Id.* He identifies two dates—November 20, 2016, and March 11, 2015—in which he allegedly suffered serious burns from the water inside the shower.

Prisoners do not have the constitutional right to shower each day. *See Vinson v. Tex. Bd. of Corr.*, 901 F.2d 474, 475 (5th Cir. 1990). But the deprivation of the basic elements of hygiene can violate the Eighth Amendment. *Daigre v. Maggio*, 719 F.2d 1310, 1312 (5th Cir. 1983); *see also Johnson v. Tex. Bd. of Crim. Justice*, 281 F. App'x 319, 322 (5th Cir. 2008). Here, while Fountain suffered burns on at least two occasions, he has not shown that Defendants acted with deliberate indifference to his health and safety. He presents no evidence that anyone purposely entered the pipe chase and altered the water temperatures in the shower. Similarly, he provides no evidence illustrating that water temperature from the shower caused his various burns.

Furthermore, the record includes an affidavit from Michael McNeil, Major at the Coffield Unit. McNeil explains that restrictive housing within the Coffield Unit utilizes separate showers than those provided in general population, (Dkt. #251, pg. 53). Specifically, prisoners housed in restrictive housing do not have community showers "and must be escorted to the single showers beginning at 4:00am until 11:30pm." *Id.* Prisoners may choose not to shower and opt to stay inside their cell; McNeil emphasizes that if a prisoner chooses to forgo a shower, the prisoner is not prevented from requesting a cool-down shower—which is also separate from the main shower. *Id.* Tommy Pharis, Maintenance Supervisor-Program Supervisor at the Coffield Unit, explains that restrictive housing has showers on each wing and shower "temperatures are set using the same mechanism that controls all potable hot water distribution," (Dkt. #251, pg. 197).

21

Other than his own self-serving assertions, Fountain provides no evidence that any prison official physically, while inside the pipe chase, altered the water temperature of the showers in restrictive housing—let alone that Defendants "maliciously directed and/or allowed officers" to do so. He insists that Defendants employ an "off record practice" of training officers to alter the water temperatures by "secretly adjusting valves," but provides no evidence of this.  Fountain directs the Court to his Exhibit 676A, which is a Step One grievance wherein he alleged that a Lieutenant "turned all the hot water off," and "would not turn out hot water on," (Dkt. #278-2). This grievance is not evidence that anyone adjusted the water temperature. Likewise, Fountain's handwritten notes are not competent evidence:



Dkt. #276-56. Fountain's allegation that Defendants directed officials to manipulate temperatures in the shower is pure speculation, as is his response to Defendants' images of the shower valve in

which he claims that officers set the valve correctly for purposes of the image. Speculation will not defeat Defendants' motion for summary judgment. *See Reynolds v. Woods Cnty., Tex.*, 2023 WL 3175467, at *7 (5th Cir. May 1, 2023) ("Mere improbable inferences and unsupported speculation are not proper summary evidence.").

Fountain has not shown that the shower water caused his burns. For example, on November 20, 2013, he complained of burns, (Dkt. #254, pg. 277). But the investigation report shows that the officer who removed Fountain from the shower that day did not see any burns on his body after his shower was complete—and reveals a two-hour gap between when he exited the shower and when he reported the burns. *Id*. at pg. 463. Fountain states that its contents are false:

*[handwritten note above report:]* It was the 4 row shower. See previous page.

*[handwritten note above report, right:]* It was 8:15 that he put me in the shower.

```
I-16711-11-13                          INCIDENT REPORT                      PAGE  2
THE WATER ON AND HE WAS BLASTED WITH SCALDING HOT WATER. OFFENDER
FOUNTAIN WAS ESCORTED TO THE UNIT INFIRMARY FOR EVALUATION. MEDICAL
STAFF EXAMINED OFFENDER FOUNTAIN AND NOTED FIRST AND SECOND DEGREE
BURNS TO HIS CHEST AND ARMS. MEDICAL STAFF APPLIED SILVER SULFADIAZINE
TO THE AFFECTED AREAS AND OFFENDER FOUNTAIN IS SCHEDULED FOR TREATMENT
FOR FIVE DAYS. AN INVESTIGATION WAS CONDUCTED INTO THE INCIDENT.
OFFICER THOMAS, ISIAH CO II WAS INTERVIEWED AND HE STATED THAT HE PUT
OFFENDER FOUNTAIN IN THE 3-ROW SHOWER AT APPROXIMATELY 0800 HOURS.
AT APPROXIMATELY 0815 HOURS, OFFICER THOMAS REMOVED OFFENDER FOUNTAIN
FROM THE SHOWER AND PLACED IN HIS CELL. OFFICER THOMAS STATED THAT
OFFENDER FOUNTAIN DID NOT COMPLAIN ABOUT BEING BURNED OR THE SHOWER
BEING TO HOT. OFFICER THOMAS STATED THAT NO OTHER OFFENDERS ON 3 ROW
COMPLAINED ABOUT THE SHOWER BEING TO HOT OR HAVING ANY BURN MARKS.
THOMAS STATED THAT OFFENDER FOUNTAIN DID NOT HAVE ANY BURN MARKS WHEN
HE REMOVED HIM FROM THE SHOWER. OFFENDER FOUNTAIN DID NOT NOTIFY
SECURITY  STAFF OF HIS INJURIES UNTIL APPROXIMATELY 1000 HOURS. ON 11-
21-13 AT     APPROXIMATELY 0915 HOURS, MAINTENANCE SUPERVISOR JOHN PERRY
AND RISK  MANAGER GIDGETT MCKNIGHT WENT TO I-WING 1 ROW PIPECHASE AND
CHECKED    THE WATER TEMPERATURE AT THE MIXING VALVE. THE WATER
TEMPERATURE WAS    75 DEGREES WHEN THEY FIRST ARRIVED. THE WATER WAS
TURNED ON AND RAN    FOR FIFTEEN MINUTES AND THE TEMPERATURE WAS 109
DEGREES AND WAS WITHIN  GUIDELINES FOR WINTER WEATHER. DUTY WARDEN
PATRICK COOPER WAS NOTIFIED AT 0745 HOURS. THE EMERGENCY ACTION CENTER
WAS NOTIFIED AT 0958 HOURS AND GINGER THOMPSON ASSIGNED INCIDENT
NUMBER I-16711-11-13.
```

*[handwritten annotations at right of report:]* All False F.F.

*[handwritten note below report:]*

This record was created by Lieutenants Stotts and White. When I gave them my written and verbal statement in their office, they smirked at me. Stotts even mocked me saying: "Well if you had been burned before (he knew we were all being burned in the showers) why did you get it?" "Because I needed a shower, real bad," I replied. Stotts smirked at me again.

They had officer Thomas write a false statement then created this falsified record.

Risk Manager Gidgett Mcknight (above) equally participated in the administrative cover up of all Ad-Seg (abusive) conditions for years.

F. Fountain

(Dkt. #283-18, pg. 25) (Exhibit 4124A). Not only are these handwritten notations inadmissible, but Fountain fails to present any evidence showing that records were falsified. Because unsupported speculation and conclusory allegations are insufficient, Fountain's claims regarding alleged hot water inside the shower should be dismissed with prejudice.

With respect to cold water temperatures inside the showers, Fountain again provides no evidence showing that Defendants manipulated the temperatures inside the showers. He asserts that "his health and life were severely threatened with high risk of hypothermia and pneumonia," when the water was cold. But the concern or fear of future, speculative injures is not competent summary judgment evidence.

Fountain further maintains that he was forced to forgo showering because of the extreme water temperatures. To the extent he is arguing that Defendants deprived him of the basic elements of hygiene, his claim fails because the competent summary judgment evidence illustrates that prisoners inside restrictive housing are offered daily showers—and Fountain was both offered and took showers. *See Daigre v. Maggio*, 719 F.2d 1310, 1312 (5th Cir. 1983). Contrary to his contention that he was forced to "refuse a shower nearly year round for six years to date," (Dkt. #95, pg. 11), the competent summary judgment evidence shows that Fountain showered during his time in restrictive housing.

Specifically, Defendants provide Fountain's "Administrative Segregation Activity Logs," dating back to 2012 indicating that Fountain took showers. *See* Exhibit E. Prisoners do not have the constitutional right to shower every day or to dictate when they shower. As Defendants argue, given that the evidence shows that Fountain showered throughout his time in restrictive housing, he fails to demonstrate that he was deprived of the basic elements of hygiene through extreme water temperatures inside the showers:

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

for years now, the coffield Unit has been violating TDCJ Policy, State Law, and our Constitutionally protected rights as well as International Law under Treaties. We have been denied the right to be clean by denying everyone in Ad Seg a daily shower. For years we've only been allowed a shower 3 times a week period! Mon, Wed & Fri only. It is scientifically proven that uncleanliness greatly increases the risk of catching contagious infectious diseases. There for by denying us cleanliness, the Unit is knowingly and intentionally endangering all of our lives and health. They are and have been doing this for years directly violating many laws and rights. The Unit responded to one of my grievances about this last year in 2012 that it was being done due to maintenance problems within the facility. First of all, it wouldn't matter the reason why it was being done, its violating the law and our rights if it's done even a single day. So I suppose it's still being done due to maintenance problems huh. And not at all that by doing it, it greatly decreases the work load of the officers and reduces cost of water and sewer treatment and distribution. The last response stated that (all non-working inmates) are being showered 3 times a week. Does that mean we (as a class) do not have the same need for a shower or rights to one as the working inmates? Are we also being discriminated against as a class? Yes we are. We sweat and need showers too. We live in unsanitary cells (never cleaned by the Unit ever) nor are we given any (much less the proper) cleaning supplies to clean these cells. Then the Unit will only give us clean clothes 3 days a week then a shower only three days a week. This constitutes (also) Cruel and Unusual Punishment and violates our Due Process of the Law and Discriminates against us as a class. MAY 0 & -013

I-127 Front (Revised 11-2010)    YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM

(OVER)

**FountainDef04815**

Dkt. #276-22, pg. 572. This grievance demonstrates that Fountain was permitted to shower at least three days per week in 2013. His unsubstantiated assertions concerning water temperatures do not defeat Defendants' motion for summary judgment.

### b. Sleep Deprivation

Fountain maintains that all Defendants intentionally deprived him of sleep continuously for years:

- See sleep deprivation allegations later in this lawsuit. The eight defendants employed the technique of having Fountains wing officers routinely approach him at such times as 3-5 o'clock in the morning for his only available shower, aware that he had not had enough sleep, which forced him out of duress as intended, to have to refuse his shower by choosing the basic human need of sleep, over the basic human need of the shower ;

Dkt. #95, pg. 11 (amended complaint). He further argues that Defendants "robbed" him of sleep for six years by "directing, supervising, and allowing all of Fountains cell block officers to conduct basic operations around the clock 24 hours a day." *Id*. at pg. 21.

It is well-settled that sleep is a basic human need. The Fifth Circuit has held that prison conditions specifically designed to prevent sleep *could* violate the Eighth Amendment. *See Garrett v. Thaler*, 560 F. App'x 375 (5th Cir. 2014) (emphasis supplied); *see also Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999) (explaining that sleep constitutes one of life's basic necessities and, therefore, "conditions designed to prevent sleep may violate the Eighth Amendment.").

The summary judgment evidence here includes Garth Parker's affidavit highlighting the Coffield Unit's 24-hour building schedule, which is a TDCJ-wide policy, (Dkt. #251, pg. 190-92). Parker explains that TDCJ's primary responsibility is maintaining custody and control over its offenders—and, thus, it "must operate safe and secure facilities in as fiscally sound a manner as possible," (Dkt. #251-5, pg. 190). Under Administrative Directive (AD) 03.40 'Out-of-Cell Time for General Population Inmates,' the 24-hour schedule is a daily, chronological list of all activities on the Unit "detailing, at a minimum, the times each housing area shall have access to programmatic and non-programmatic activities," which ensures that prisoners housed within general population are provided activities outside their cells. *Id*. Those housed in restrictive housing do not have programmatic activities and "have their meals, and medications, necessities,

and commissary delivered cell side." As a result, prisoners in restrictive housing may sleep all day if they wish. *Id.* at pg. 191. He also explains the different forms of prison "counts":

| Count | Commences | Concludes |
|---|---|---|
| 1st Count | Midnight | 1:00am |
| 2nd Count | 1:30am | 2:30am |
| 3rd Count | 4:30am | 5:30am |
| 4th Count | 8am | 9am |
| 5th Count | 12:30pm | 1:30pm |
| 6th Count | 5:30pm | 6:30pm |
| 7th Count | 8pm | 9pm |
| 8th Count | 10:30pm | 11:30pm |

Formal count is to be taken a minimum of eight times in one twenty-four-hour period. It is merely a count of the inmates, not an identification process. During the formal count all inmate movement stops and correctional officers report to their assigned area to count the inmates. The inmates are counted where they are. They may be in the dayroom, on the recreation yard, or sleeping in their cell. Correctional officers performing these counts note the total number of inmates counted on a unit count sheet which contains no identifying inmate information. This count is a mere physical count of bodies on the unit.

"Bed Book Count" is a physical count of offenders that requires a verbal response and positive identification of the offender using the offender's identification (ID) card, or temporary ID if waiting for an ID card. At least once every 24 hours, during a time specified by the warden or designee, correctional officers in housing areas shall perform a bed book count using the most current count room generated housing roster. Normally, a bed book count is performed during nighttime hours when offenders are confined to their housing areas. The counting correction officers are trained to walk the housing run and the inmates are instructed to come to the cell door with their TDCJ-ID. The inmates show the counting correctional officer their identification cards and give the correction officer time to compare the inmate's name and TDCJ identification number to the housing roster. The primary purpose of the formal and bed book counts is to maintain the accountability of the inmates incarcerated on the unit, to ensure the safety of all officers, inmates, and staff employed on the unit as well as the safety of the public by taking measures to prevent escape, suicide, and assaults.

Dkt. #251-5, pg. 191.

Parker further states that the Coffield Unit serves breakfast from 3:00am through 4:00am "to give inmates time to either go to the cafeteria or to be served cell side means in restrictive housing." Prisoners may choose to skip breakfast and sleep in. Moreover, because prisoners in restrictive housing do not enjoy programmatic activities and must be individually escorted to a shower, "showers begin at 4am and last until 11:30pm." *Id.* at pg. 192. As with breakfast, Parker explains that a prisoner may choose to stay in his cell if he does not want to shower. *Id.* He also highlights specific "activities" on the schedule for prisoners in restrictive housing:

27

> If an inmate in restrictive housing does not have a medical appointment, transfer for a bench warrant or other matter, the next activity on the schedule is recreation at 6:00am to 10pm. Recreation in restrictive housing will consist of outside recreation if the weather permits or the dayroom, again escorted. The remainder of the day revolves around meals; lunch is delivered cell side between 9:30am to noon and dinner is delivered between 2:30pm to 4pm. The 10:30pm bed book count requires the inmate to present himself before a correctional officer. This is after all the inmates "rack up" and are required to be in their cells.
>
> The 24-hour building schedule is a TDCJ-wide policy, which each unit being responsible for implementing its own building schedule. For the Coffield Unit, approximately 4200 inmates have to be kept on schedule and task. The building schedule is extremely important as it allows the facility to operate and all counts to be conducted. The safety and security of the TDCJ's inmates, employees, and the general public is the main reason for 24-hour building schedule. It is generally structured around the counts that take place to ensure all inmates are accounted for. The schedule takes place over a 24-hour period in order to ensure that inmates have time for all their programs, religious activities, schooling, work, meals, showers, and recreation. This building schedule also allows TDCJ to spot and prevent security issues such as escapes or out of place inmates when a deviation from the building schedule is noticed. The schedule is reviewed and changed if needed on an annual or biannual basis at the unit level and is reviewed and approved by the American Correctional Association (ACA) to make sure it meets correctional standards when the unit is audited.

*Id.* at pg. 192. Parker attaches the Coffield Unit's 24-hour schedule to his affidavit, which was revised in March 2020. *Id.* at pg. 194-95.

Here, as Defendants maintain, Fountain has not shown that Defendants intentionally employed conditions designed to prevent sleep. The competent summary judgment evidence shows that the Coffield Unit's 24-hour building schedule—which is the same for prisoners housed in general population and restrictive housing—is designed to maintain order, security, and safety for the prisoners and prison staff.

In fact, federal courts in Texas have rejected claims on summary judgment from prisoners arguing that the 24-hour building policy violated their rights under the Eighth Amendment. *See, e.g.*, *Walker v. Nunn*, 456 F. App'x 419, 533 (5th Cir. 2011) ("Nunn's testimony established the absence of a genuine issue of material fact regarding whether he and the other defendants took reasonable measures in balancing the daily activities necessary to the functioning of the prison and

the time during which prisoners could choose to sleep."); *Garrett v. Davis*, 2019 WL 1233675, at *1 (S.D. Tex. Mar. 2019) ("At trial, Garrett did not provide any evidence that an alternate 24-hour building schedule could be constructed within the resources of TDCJ to provide more continuous sleep or that the current schedule was an unnecessary and wanton infliction of pain."); *Wallace v. Sifuentes*, 2019 WL 4739422, at *8 (S.D. Tex. June 6, 2019).

Fountain's case here is no different. While he highlights the prison's 24-hour building policy, he has not shown that it was designed to prevent his sleep. Fountain merely insists, without admissible evidence in support, that Defendants "intentionally" precluded him from sleeping. Instead, The competent summary judgment evidence reveals that the Coffield Unit's 24-hour schedule was designed to maintain safety, security, and order. Fountain presents nothing—other than his own self-serving assertions—that the 24-hour building schedule, which is a TDCJ-wide policy and therefore affects all prisoners, was designed and used specifically to prevent *his* sleep. *See e.g.*, *BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996) (explaining that a conclusory, self-serving statement was insufficient to create a triable issue of fact).

Instead, Fountain's outline of the hourly schedule of identification checks, counts, laundry pick-up, and the like further bolster the argument that any disruptions to his sleep stem from prison operations, which are related to a legitimate penological goal. *See Armour v. Davis*, 2020 WL 2850140, at *16 (E.D. Tex. June 1, 2020) ("Even taking his allegations as true, he offers nothing to suggest that the sleep disturbances of which he complains are done in an unnecessary or wanton manner in order to prevent him from sleeping rather than resulting from activities necessary to keep a community of almost 4,000 persons functioning.").

In response, Fountain maintains that Defendants failed to point to evidence of the prison's schedule during his time at the Coffield Unit between 2011-2017, as the document shows that the

schedule was revised in 2021. But Fountain readily admits that the Coffield Unit operates on a 24-hour schedule—outlining the various prison operations scheduled throughout the day and evening. He also insists that the Parker affidavit relies on the schedule for general population prisoners only; however, it includes hourly entries identifying administrative segregation operations:

PageID #: 1320



## H.H. Coffield Unit
## 24 Hour Building Schedule

Revised March 2021

| | | | | |
|---|---|---|---|---|
| 0001 | Thru | 0100 | 1st COUNT TIME | Daily |
| 0100 | Thru | 1000 | Kitchen Workers/Cooks P/6 & T/C 1st shift | Monday-Sunday |
| 0130 | Thru | 0230 | 2nd COUNT TIME | Daily |
| 0230 | Thru | 0330 | Diabetics & DOT's | Monday-Sunday |
| 0300 | Thru | 0400 | Breakfast Meal | Monday-Sunday |
| 0300 | Thru | 1100 | Kitchen Cooks Main Kitchen / Laundry 1st shift | Monday-Sunday |
| 0300 | Thru | 0400 | Pill Window Open A&B Side | Monday-Sunday |
| 0400 | Thru | 1030 | TVCC/Vocation (Data Processing/Auto/Cabinetry | Monday-Friday |
| 0400 | Thru | 1300 | Incoming and Outgoing Chain | Monday-Friday |
| 0400 | Thru | 2230 | Showers Ad Seg (P1, P2) | Monday-Sunday |
| 0400 | Thru | 2200 | Ad Seg Escorts (medical, parole) | Monday-Sunday |
| 0400 | Thru | 0600 | Showers (P3, P4) | Monday-Sunday |
| 0400 | Thru | 0430 | Mail Pick Up For Ad Seg | Monday-Sunday |
| 0400 | Thru | 0600 | Law Library 1st Session | Monday-Saturday |
| 0415 | Thru | 1045 | Data Processing | Monday-Friday |
| 0430 | Thru | 0530 | 3rd COUNT TIME | Daily |
| 0500 | Thru | 0900 | Medical Sick Call- Unit Infirmary | Monday-Sunday |
| 0515 | Thru | 0545 | Ad Seg Shift Briefing | Daily |
| 0530 | Thru | 1400 | Laundry Necessity (only shift) | Monday-Friday |
| 0530 | Thru | 1030 | Maintenance Turnout | Monday-Friday |
| 0545 | Thru | 1600 | Metal Fabrication Industry | Monday-Friday |
| 0600 | Thru | 0630 | General Population Shift Briefing | Daily |
| 0600 | Thru | 1500 | Welding / TVCC-Vocation | Monday-Thursday |
| 0600 | Thru | 1400 | Kitchen Workers Main Kitchen 1st shift | Monday-Sunday |
| 0600 | Thru | 2200 | Ad Seg Recreation | Monday-Sunday |

Dkt. #251-5, pg. 194. He also highlights that one of his sleep complaints stems from prison noise:

> Parker claims seg inmates could sleep "all day" if they desire. That was not true. The noise levels alone obviously prevented that, which were much worse during the day. See "Noise", this pleading.

Dkt. #276-8, pg. 421. Federal courts have repeatedly rejected claims of sleep deprivation stemming from noise inside the prison. *See, e.g.*, *Ross v. United States*, 2013 WL 5290498, at *2 (N.D. Tex. Sept. 18, 2013) ("Although plaintiff claims the excess noise prevented him from getting a full night's sleep, he alleged nothing to show the existence of noise intentionally designed to deprive him of sleep") (citing *Johnson v. Tex. Bd. of Crim. Justice*, 218 F. App'x 319, 322 (5th Cir. 2008));

*Backstrom v. Thayler*, 2012 WL 2847742, at *3 (N.D. Tex. June 26, 2012) ("The Court notes the Clements Unit, like a small city, must operate on a twenty-four-hour basis to perform the tasks required to keep the prison functioning."). Here, Fountain failed to demonstrate that any named Defendant violated his rights by purposely depriving him of sleep.

### c. Food and Nutrition

Fountain complains at length about the food at the Coffield Unit. He maintains that Defendants provided "half the daily calorie intake" and replaced proteins with poor quality items. Fountain claims that Defendants intentionally starved him for years:

the above given to Fountain and the other inmates, All with malicous intent and purpose of physical harming and starving the inmates, subjecting unwarrented punishment and extreme year round cruelty, and causing serious psychological harms promoted of self harm or suicide.    For example. Although policy required and their records falsly indicate some 1460 meal drinks provided each year, all types of needed meats, vegitables, fruits and nutrients at each meal, salt, pepper, cups and eating utensils provided, they never were. Despite their officials records and cooksheets indicating, 4 ounces of 3 different sides given with meals, only 1-3 oz's were actually given or none at all. Despite those same

records incating milk, raisens, eggs, meats, gravy, ketchup mustard and a wide range of other food items provided as policy required, such items were routinely not given to the inmates at all. When eggs were documented - protein less dry pancakes were normally given instead 280 times or more a year. All tole, the 4 defendants and all other cooberating security, administrative and food service staff not only provided half the daily calorie intake, but intentionally malnurished the inmates and Fountain as well by taking away proteins and other needed higher nutrients, and replacing, if any, with very poor quality and lower nutrient based foods all year with intent to malnurish and starve the inmates to severe degree.    Because they never provided any type

Dkt. #95, pg. 17-18. (amended complaint). Fountain claims that he weighed 194 pounds upon arrival at the Coffield Unit. Based on his mathematical calculations, Defendants provided him with 500-900 calories per day despite his high-caloric diet. In June 2018, he weighed only 136 pounds and prison officials falsified his medical records to make him appear heavier. Dkt. #276-8, pg.438.

It is well-settled that the Constitution requires inmates be provided with well-balanced meals, consisting of sufficient nutritional value to preserve life.  *See Green v. Ferrell*, 801 F.2d 765, 770-71 (5th Cir. 1981).  However, "[t]he deprivation of food constitutes cruel and unusual punishment only if it denies the prisoner the minimal civilized measure of life's necessities." *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (internal citation and quotation omitted).

The prison system is not required to provide inmates with three meals per day.  *See Green*, 801 F.2d at 770. Specifically, the Fifth Circuit has repeatedly held that "the provision of at least two nutritionally adequate meals daily satisfies the Eighth Amendment's constitutional requirement of adequate food for prisoners." *See Green*, 801 F.2d at 770-71 (explaining that even on a regular, permanent basis, two meals a day may be adequate); *Berry*, 192 F.3d at 507 (the deprivation of eight meals over a seventh-month period did not deprive the inmate of the minimal measure of life's necessities); *Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998) (expressing doubt that a prisoner who missed 50 meals in five months, or one out of every nine meals, and lost 15 pounds established a constitutional violation).

To prevail on a claim regarding food deprivation, a prisoner must allege facts which show that the defendant provided him with food that endangers his health and the defendant acted with deliberate indifference. *See Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999); *Reagan v. Burns*, 2019 WL 6733023, at *16 (N.D. Tex. Oct. 30, 2019) ("Plaintiff only offers conclusory allegations to support his claim that the prison diet was inappropriate for his condition and caused

him harm").  Deliberate indifference requires a showing that the defendants (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew the inference. *See Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999).

Here, while the parties do not dispute that Fountain lost weight while imprisoned, the record fails to demonstrate intentional starvation and malnourishment. The evidence contains a substantial number of Fountain's grievances in which he complained at length about the prison food, to which prison officials conducted numerous investigations. *See* Dkt. #259-262. (Defendants' Exhibit H, part 3). Fountain's complaints concerning the food are best encapsulated by this grievance:

> We did not get eggs again this morning. There only giving eggs to us about one morning a week. We only got two pieces of bread with syrup on them and grits. Were not getting our fruit either. We are being denied proper nutrition at breakfast. I believe food service is not giveing us what Huntsville is outlining for us to get. The whole thing could possibly be a conspiracy to save dollars at the expense of the inmates health. If we dont get proper nutrition it is considered inhumane, Cruel and unusuall punishment, Warrenting relief from outside sources. The matter could be considered criminal.
>
> I do NOT Have a ink pen to write this with, therefore it must be pursued written in pencil. SEP 2 2 2011

Dkt. #259-1, pg. 3. In this particular grievance, Fountain complains about the frequency in which he receives eggs for breakfast—and further notes that he was served two pieces of bread and grits.

The evidence also indicates that prison officials investigated Fountain's egg-complaints and explained to him that the Food Department at the Coffield Unit "didn't have eggs," as they were unavailable on September 18, 2011, through September 21, 2011. *Id.* at pg. 4. Fountain has

not shown that the denial of eggs at breakfast—or only being served eggs "about one morning a week"—constitutes an Eighth Amendment violation.

Fountain also states that the meals did not contain enough calories to sustain health. But his claims concerning caloric content are conclusory and speculative—which do not defeat a properly supported motion for summary judgment. *See Rogers v. Jarrett*, 63 F.4th 971, 975 (5th Cir. 2023) ("Still, conclusion allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not count for raising a genuine factual dispute."). By way of example, Fountain provides the following meal log from September 1, 2015:



Dkt. #280-1, pg. 16. Fountain provides no support, for example, that the pancakes were 3 ½ inches or that they contained only 158 calories. Likewise, these September 2016 food logs demonstrate the conclusive, speculative, and even subjective nature of his claims:

Food Log

s.s. = small slot on food trays

O+ = very little peanut butter on pm snack sandwich

m = no pm snack sandwich recieved at all

9-22-16 ① dry P only, no butter or syrup, only ½ ss of oatmeal ② only ½ ss of corn side and a rotten uneatable banana. ③ no meat in watery small porportion veg stew main, all 3 sides ½ or less of s.s., the main is all carrots (6 ½"thin slices) and water! 3oz m O+

9-23-16 ① egg loaf, the 2 biscuits only ⅜"thin, no fruit on tray ② 2 sides only ½ s.s. ③ both given sides only ½ ss, missing one side of vegs, no meat at all in corn bread and veg. stew main — mostly bread.

9-24-16 ① dry small P's only, no syrup or butter, no fruit cuz (rotten) uneatable banana given. ② no meat at all in noodle main, one side only ½ s.s. ③ all 3 sides ½ ss or less

9-25-16   NOT WELL

9-26-16 ① dry P only no syrup or butter, only ½ ss of fruit, b.s. cereal ② less than one teaspoon of meat in bean main, missing side of beans ③ less than a teaspoon of meat in noodle main, and two sides only ½ s.s.

9-27-16 ① dry P only no syrup or butter ② no required tarter sauce with small piece of fish. ③ missing one side of veg's.

9-28-16 ① syrup bread only, no butter, only ½ ss's of apple sauce and grits, nothing else. ② only ½ ss. of beans ③ pork sloppy Joe no bread and very little meat - mostly grease and water 80% O+

9-29-16 ① dry P's only, no syrup or butter, less than ½ ss of both fruit and oatmeal ② double stacked trays, only a teaspoon of meat in noodle main ③ one small ½" x 1½ x 2" piece of meat - less than half the amount required/needed, two sides of beans and cucumbers only ½ s.s. O+

9-30-16 ① eggs no meat on tray, no butter etc. (porportion of eggs way to small - 2 bits is all) ② only a 2½ inch piece of sausage, suppose to be 2 or 3 times that amount, and only a ⅓ ss of one side. I bowed my head wanting to cry and the officer snickered and said "They're trying to kill yall," and closed the slot and moved on. ③ no meat at all in noodle main, missing a side of veg's, bean side only ½ ss. m

10-1-16 ① dry P only, only ½ ss grits, ② two sides only ½ ss or less, little meat in veg stew main. ③ main porportion too small, one side of veg's only ½ ss, other 2 sides ½ ss or less. O+

Dkt. #280-1, pg. 33. While Fountain alleges in a conclusory manner that he received "very little peanut butter," he provides no specific facts to quantify this assertion. Fountain's statements that he was provided "very little" peanut butter, fruit, or meat are also subjective. His grievances and food logs refute his claim that he was starved.

Turning to Fountain's undisputed weight loss, any claim of deliberate indifference fails. He also fails to show that any weight loss was caused by lack of calories/nutrition or by

Defendants. The competent summary judgment evidence indicates that Fountain's weight loss is attributable to reasons other than lack of calories/nutrition—as he suffered from hypothyroidism, which the record indicates can accelerate metabolism and cause weight loss.

The summary judgment evidence shows, through hundreds of pages of records, that prison officials conducted many investigations into Fountain's complaints of starvation and malnourishment. For example, when he levied complaints regarding the lack of protein during breakfast—complaining that he was only served one fried egg on December 11 and 13, 2011— prison officials launched an investigation. Fountain initiated the issue as by stating the following:



Dkt. #259-1, pg. 51 (TDCJ grievance number 2012065039). The docket contains kitchen records for these dates, showing that Fountain was served the following at breakfast on December 13, 2011:

Dkt. #259-1, pg. 56. The worksheet indicates that a fried egg, oatmeal, biscuits, margarine, water, apples, and a breakfast drink were served on December 13, 2011. Similarly, when Fountain again complained about lack of protein in April 2013, prison officials commenced an inquiry, (Dkt. #260-1, pg. 22-32) (grievance number 2013128879). Fountain alleged that he was not receiving protein:



Dkt. #260-1, pg. 27. In response, prison officials explained that, per the food services procedures, "meat, poultry, fish, beans, eggs, and peanut butter" qualify as "meat" and that "on the days that pancakes are served peanut butter is also served," which meets the daily requirement set by TDCJ.

*Id*. at pg. 32. Prison officials also explained to Fountain that "breakfast meals are frequently served with eggs which is adequate protein." *Id*. at pg. 28.

In this final example, Fountain sent a Step One grievance to prison officials at the Coffield Unit concerning nutritional content, proper proportions, and calories in August 2015. He demanded that "food, drink, calories, and nutritional content and values deficiencies corrected, and all of us given proper and adequate meals, meat, milk, sides, proper proportions, butter, syrup, and daily nutrition and calory [sic] intake":

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

> I am grieving all relevant or applicable staff involved (a lot of actual id's unknown) including the Food Service Captin and Food Service Managers, all ad-seg correctional officers, Lieutenants, Sergeants, Captin Stotts, Major Mitchell, B. Howard ARD and McClellar ARD, Brad Livingston, and Wardens Rupert, Cooper and Richardson all intentionally not providing or ensuring we are provided adequate and constitutionally proper meals regularly, Many of the meals given us have no meat at all or almost no meat at all, the porportions are often too small and likely ½ of what is required or less, the trays often are missing entire sides and secondary food groups porportions required, The pancake trays and syrup bread trays at breakfast or lunch/dinner have no required butter or margerin or syrup. And we are seldom ever given any milk at breakfast as required. All of which continually strips our overall daily calorie intake drastically compared to what its required and/or needed to be. And simultaneously causes depletion of good health because we're not being given a well balanced and nutritionally complete diet continually all year on a regular daily basis. This is continually harming us all back here, Starving all those of us who are indigent and cant supplement the deficiencies in our diet with Foods, calories, etc, from commissary purchased foods and drinks, I just talked to Warden Rupert about this and gave him a written description of this and several other wrongfull and violative conditions back here on 8-11-15 and he has not acted or acted reasonably to have corrected any of what I informed

Dkt. #260-2, pg. 67. (grievance number 2015195948). In response to this grievance, prison officials once again launched an investigation—obtaining witness statements in the process. One prison official, who is not a party in this case, remarked that in his experience in the kitchen, "the

kitchen workers put more than enough on the trays" and that the "actual amount each offender[]s gets on each tray has been too much" and that he has told the kitchen workers to "cut back" because the trays overflow. *Id*. at pg. 71. Prison officials concluded the investigation by explaining that there was insufficient evidence to support Fountain's allegations that he was served inadequate meals. *Id*. at pg. 66; 68; 70-71. The Court notes that there are additional examples of prison officials investigating Fountain's various complaints about his meals at the Coffield Unit. However, the three examples above demonstrate that when Fountain complained about the meals, prison officials investigated, and no evidence was garnered to support the allegations of starvation.

Moreover, the evidence shows that Fountain was provided both a PM snack and a hyper-caloric diet at times throughout his incarceration at the Coffield Unit. The summary judgment evidence includes (1) the September 2, 2015, order for Fountain's PM snack, (Dkt. # 260-2, pg. 82); (2) medical records showing that he was issued a hypercaloric diet in 2016 and 2017, (Dkt. #254-1, pg. 180; Dkt. #154-1, pg. 182); (3) the March 2017 prescription for a hypercaloric diet, (Dkt. #254-1, pg. 182); (4) his TDCJ medical diet list that specifically identifies a hypercaloric diet, (Dkt. #262-1, pg. 11); and (5) the order for a hypercaloric diet in 2017. (Dkt. #280-9, pg. id. #14494.)

```
CSOST09A/CSOSBA/DSBA      TEXAS DEPARTMENT OF CRIMINAL JUSTICE        11/21/2017
GD000G4 /CF51                OFFENDER SERVICES TRACKING SYSTEM        12:19:45
                           MEDICAL DIET/SNACK/ALLERGY BY TDCJID

ENTER TDCJID: _____

TDCJID#:   01649115    NAME: FOUNTAIN,FREDDIE LEE
UNIT:      CO  COFFIELD                          HOUSING:   J-4

TRAY TYPE:  D
DIET PLAN: HYC   HYPERCALORIC DIET
DIET ORDER: 36374  HYPERCALORIC DIET
```

Such evidence rebuts Fountain's claims that the Defendants acted with deliberate indifference.

In response, Fountain repeatedly insists that most of the records are "falsified":

Falsified TDCJ Coffield unit Food Service ("Cook's Worksheet") records at various dates between 2012'-14'. Defendant Modesto Urbina drafted and signed a portion of them.

Note: Defendant Urbina was a lower level Food Service manager working under Captin Beil, before ascending up into the Food Service Captin's position (Urbina) himself.

Dkt. #286, Exhibit 4138A, pg. 7. But Fountain. fails to present any evidence of falsification.

Federal courts have repeatedly found that conclusory allegations of "falsified" prison and medical records lack merit and are insufficient to defeat a motion for summary judgment. *See, e.g.*, *Romero v. Lann*, 305 F. App'x 242 (5th Cir. 2008) (holding that Romero's "conclusional assertions" that his disciplinary cases were fabricated are insufficient to defeat summary judgment); *Knighten v. Ott*, 69 F. App'x 657, 2003 WL 21355964 *1 (5th Cir. May 2003) ("His conclusory assertions that he did not stockpile pills, that he would have received a disciplinary case if he had, and that his medical records were falsified are insufficient to defeat the medical defendants' summary-judgment evidence or to create a genuine issue of material fact.") (unpublished); *Mornes v. Valdez*, 2020 WL 4340951, at *6 (N.D. Tex. Apr. 30, 2020) ("While Plaintiff denies this timeline and asserts that his medical records have been altered to fit Defendants' narrative, there is simply no evidence to suggest that and Plaintiff's conclusory allegations are not enough to create a genuine issue of material fact on that point.").

Similarly, Fountain placed handwritten notations of "falsified" throughout his submissions but fails to show actual falsification:



Dkt. #277-45, pg. 411. With no support, Fountain states that prison officials "had the scales loaded" to specifically record that his weight was higher:



Dkt. #284-7, pg. 514. These freestanding assertions of "falsified," "falsification," and "false!" do not suffice on summary judgment. *See, e.g.*, *Johnson v. Harris Cnty.*, 2022 WL 4137842, at *4 (S.D. Tex. Sept. 9, 2022) ("Mr. Johnson's unsworn and conclusory allegations of excessive force and falsified documents are insufficient to create factual disputes that can defeat the motion for summary judgment.").

Fountain fails to show causation. The summary judgment evidence indicates another explanation for Fountain's weight loss: a March 2017 hypothyroidism diagnosis, which can

accelerate metabolism and cause weight loss. Fountain has not shown that his weight loss was caused by lack of nutrition rather than a medical condition. He maintains that his hypothyroidism only exacerbated his weight loss:

> The presence of Plaintiff's hyperthyroidism from July-Aug., 2016 through late 2019 did exacerbate his weight loss and heart condition, but was not the chief cause of either during that time period. Nor was it a contributing factor to either _before_ or _after_ that period, simply because it wasn't present at all.
>
> The labs from 2013 and 2015 show normal TSH levels. If the hyperthyroidism would have been present then, those levels would have been abnormally low as they were in 2016-19. It is the natural reaction of a healthy pituitary gland (Fountain's pituitary gland is healthy) to high Free T4 levels caused by hyperthyroidism. Only when the pituitary gland is dysfunctional does this not occur.

Dkt. #276-8, pg. 442. But Fountain's insistence that his hypothyroidism "was not the chief cause" of his weight loss is a self-diagnosis and medical opinion, which cannot establish deliberate indifference. *See Kayser v. Caspari*, 16 F.3d 280, 281 (5th Cir. 1994) (explaining that a prisoner's self-diagnosis alone will not support a medical conclusion); *Swyck v. Davis*, 2017 WL 4155364, at *7 (S.D. Tex. Aug. 21, 2017) (citing *Kayser* and finding that no genuine issue of material fact existed as to "whether Plaintiff faced a substantial risk of serious harm in that Plaintiff's claim of being poisoned was unsubstantiated and, in fact, controverted by the objective medical records."). Fountain's food and nutrition claims should be dismissed with prejudice.

### e. Extreme Temperatures—Hot and Cold

In his next claim, Fountain argues that Defendants knowingly created indoor cell and cell block conditions with freezing temperatures. Specifically, he alleges that:

> The three defendants maliciously directed or employed yet another violative technique and cruelty upon Fountain throughout each and every winter of the years in question. By them having knowingly and deliberately created indoor cell and cell block conditions of freezing 20 degrees – 40 degrees Fahrenheit air and blowing rain for long period of time upon

Fountain. They did so each winter by deliberately not turning the cell block heaters on when the outside temperatures ranges between 20 – 40 degrees Fahrenheit, while allowing open, screenless, broken and missing glass windows directly across from and in close proximity to Fountain's cell, and simultaneously turning the summertime exhaust ventilation system on for the entire building, and keeping it on night and day, which deliberately pulled the ice cold air in and directly on Fountain, droping [sic] his cell and cell block temperatures to 20 – 40 degrees F day and night. A condition of which not only threatened Fountain's life with risk of hypothermia and pneumonia, was extremely cruel to him and precluded his ability to undress for showers as intended. But caused him two severe injuries to his ears in 2014, to which serious medical care had to be received as well.

Dkt. #95, pg. 7 (amended complaint). He contends that the "freezing" temperatures "caused infections in both ear drums," (Dkt. #276-8, pg. 371). Fountain maintains that while the prison system provided him a blanket, it was insufficient because it was too thin.

Fountain lodges similar complaints regarding warm weather. He contends that Defendants maliciously subjected him to extremely high temperatures during the summer months—and would not provide him with cool-down showers or fluids. Fountain further asserts that TDCJ's heat-mitigation standards are "woefully inadequate"—stating that the "randomly spaced out fans" and ventilation system do nothing, (Dkt. #276, pg. 395). He also alleges that because he was housed in administrative segregation, he did not have access to "air-conditioned respite areas," and was not provided cool fluids or ice. To the extent records exist noting that Defendants provided cool fluids or ice, Fountain contends that they are falsified. *Id*. at pg. 397.

Despite recognizing the existence of heat in Texas, Fountain further maintains that Defendants maliciously failed to "have the UTMB and TDCJ identify and move" him out of the heat. *Id*. at pg. 400. He cites his medical conditions, which he argues impeded his thermoregulation and increased his risk of heat-related illnesses. Fountain identifies August 14, 2013, as a date in which he suffered from a heat-related illness and was treated on an emergency basis. *Id*. However, Fountain's claims concerning the temperatures should be dismissed. His claims concerning heat

and "freezing" temperatures—coupled with his complaints about the Coffield Unit's heating and cooling systems—are both implausible and inherently contradictory.

Beginning with the heat claims, the Fifth Circuit has held that the Eighth Amendment "guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures." *Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017). The court has repeatedly rejected the notion that the Eighth Amendment requires air-conditioned prisons. Moreover, the court repeatedly declined to establish any maximum temperate levels or requirements. *See Ball v. Leblanc*, 792 F.3d 584, 599 (5th Cir. 2015) (holding that a district court's injunction ordering air conditioning violated the PLRA because it "was unnecessary to correct the Eighth Amendment violation," as plaintiff's are not entitled to the most effective available remedy.); *Blackmon v. Garza*, 484 F. App'x 866, 872 n.6 (5th Cir. 2012) (explaining that "we do not suggest that air conditioning is mandatory to meet the requirements of the Eighth Amendment."); *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004).

*Ball v. LeBlanc* is instructive. The district court in that case issued a permanent injunction requiring the state to lower temperatures inside the prison to 88 degrees Fahrenheit, which could only be achieved through air conditioning. *Ball*, 792 F.3d at 598. In reversing the district court, the Fifth Circuit held that the injunction violated the PLRA (Prison Litigation Reform Act) because the injunction was overbroad for a variety of reasons. First, the Fifth Circuit reasoned that prisoners—under the PLRA—are not entitled to the most effective available remedy, but rather are "entitled to a remedy that eliminates the constitutional injury." *Id*. at 599; *see also Rasho v. Jeffreys*, 22 F.4th 703, 713 (7th Cir. 2022) (explaining that "the Eighth Amendment does not require the most effective solution."). The Fifth Circuit in *Ball* expressly held that air conditioning is not necessary to correct the Eighth Amendment violation.

44

Relevant here, the Fifth Circuit further explained that the Constitution does not require the elimination of all risks related to heat illnesses. *Ball*, 792 F.3d at 599 ("Some risk is permissible and perhaps unavoidable."). The Fifth Circuit highlighted how the plaintiff's own expert explained that there were many acceptable remedies short of prison-wide air conditioning—such as diverting cool air, allowing prisoners to access air-conditioned areas, allowing access to cool showers at least once a day, providing ample supply of cold water and ice at all times, supplying personal ice containers and personal fans, and installing additional ice machines. *Id*. The Court reasoned that such remedies "are precisely the types of remedies this court endorsed in *Gates v. Cook* and that the PLRA requires." *Id*.

 In this case, Fountain's has not shown that any Defendant acted with deliberate indifference to his health and safety through extreme temperatures. The competent summary judgment evidence, first, demonstrates that prison officials employ several heat-mitigation strategies to combat the heat inside the Unit. Second, there is no evidence that Defendants were aware of a substantial risk to his health or safety and then disregarded that risk.

The summary judgment evidence includes an affidavit from Michael McNeil, Major at the Coffield Unit, concerning heat and cold weather mitigation. According to policy, ice water is available to all prisoners in restrictive housing—24 hours per day, seven days per week, (Dkt. #251, pg. 52). Assigned prisoners pass out water all day and night. McNeil explains that if "an inmate requests cold water, they can request it from the cart as it passes or notify staff." *Id*. He also highlights that "during the 30-minute checks inmates can request water from staff," and that prisoners have access to water inside their cells. *Id*.

Prisoners also are permitted cooling towels and can purchase sports-drink powder from the commissary. Each prisoner has access to a personal fan as well; if a prisoner is unable to afford a

fan, "he will be supplied with on[e] through the indigent fan program." *Id*. at pg. 53. McNeil further asserts that during the warm months, "air flow is increased with two portable fans on each end of each row." *Id*. If a prisoner is designated as "heat restricted," by the University of Texas Medical Branch (UTMB), the prisoner is given an opportunity for a second, "cool-down shower" after 6:00 PM. Prisoners not designated as "heat restricted" but are feeling "dizzy or hot" are taken to a "respite area where he can cool down or to medical," (Dkt. #251-3, pg. 53).

Fountain fails to show that any Defendant acted with deliberate indifference concerning the hot temperatures. Contrary to his contentions, prison officials implement several heat-mitigation strategies at the Coffield Unit. The summary judgment evidence illustrates that prison officials permit prisoners access to cooling towels, provide ice water, and specifically train to observe signs of heat illness. Moreover, prisoners may purchase a personal fan and powder-sports drink; if a prisoner cannot afford a fan, TDCJ supplies one for him. Prisoners may request a cool-down shower and seek respite. Prison officials further increase air flow during the summer months through the use of portable fans. Water is also available inside the cells.

Fountain further failed to demonstrate that any Defendant knew of a substantial risk to his health and safety through hot temperatures and then disregarded the risk. Instead, Fountain summarily asserts that Defendants maliciously "subjected" him to extreme temperatures. Fountain must specifically point to evidence that Defendants disregarded a substantial risk of harm stemming from the heat. He has not done so.

Prisoners do not have a constitutional right to air conditioning inside their cells. *See Blackmon v. Garza*, 484 F. App'x 866, 872 n.6 (5th Cir. 2012). Accordingly, Fountain's insistence that Defendants maliciously subjected him to extremely high temperatures by refusing to install air conditioning throughout the prison is without merit. Second, the summary judgment evidence

46

contains Fountain's medical records—which do not indicate that medical officials designated him as "heat-sensitive." *See Sain v. Collier*, 2019 WL 4144321, at *16 (S.D. Tex. Aug. 30, 2019) (explaining that TDCJ maintains a "process to place certain offenders who may be at increased risk of developing heat-stress illness in air-conditioned housing by assigning every offender in the TDCJ system … a Heat Sensitivity Score based on their medical conditions and prescribed medications.").

Fountain identifies four dates on which he allegedly suffered heat-related illnesses that Defendants ignored or disregarded. However, the competent summary judgment evidence is devoid of evidence showing that Fountain suffered a heat-related illnesses. His self-diagnoses and disagreement with medical evaluations or treatments do not show deliberate indifference.

He first alleges that he suffered a heat-related illness, dehydration and shock, in mid-August 2013. He maintains that he was taken out of a the "hot environment" and into the air conditioning inside medical and directed to drink ice water—at which point the "sudden internal and external temperature change from one extreme to another caused Fountain to go into shock," (Dkt. # 276-8, pg. 401), and he was rushed to the emergency room. He claims that this "near-death injury" was purposely omitted from the medical records to protect Defendants. *Id*.

The competent summary judgment evidence, however, does not support these contentions. Rather, the evidence shows that on August 14, 2013, prison officials escorted Fountain to the Coffield Unit's medical department after receiving his complaints about food and water, (Dkt. #283-21, pg. 753). Fountain was stable upon arrival, and medical officials remarked that he appeared pale and weak. *Id*. at pg. 754. He explained that he lost twenty-one pounds in two months and was not being given the proper amount of food and water. Fountain was given water and security was informed of an issue with the water inside his cell, (Dkt. #283-21, pg. 755). Medical

officials took Fountain's urine and provided him with a second pitcher of water and a blanket. An EKG was performed, and the medical provider ordered an IV and inserted a catheter to obtain urine. The urinalysis results were given to the provider, and Fountain was later released to return to his cell—documenting an improved and stable disposition upon release. *Id.* at pg. 756. Medical officials ordered Fountain a hypercaloric diet.

A close inspection of the medical records for this August 14, 2013, medical visit is devoid of anything related to dehydration or heat. While Fountain insists that he was dehydrated and nearing "impending death," he provides no support for this other than his own self-assertions. Again, Fountain's various handwritten notes superimposed on the medical records are not competent summary judgment evidence:

10555

*Severe dehydration clearly observable. It causes high pulse. Came in with high pulse at 0900. An iv was administered and water given to me which hydrated me and lowered my heart rate. F.F.*

**Correctional Managed Care**
**Urgent / Emergent Care Record**

Dkt. #283-21, pg. 756. Fountain's insistence that he was dehydrated is a self-diagnosis, as is his assertions of "no hypertension" and that he "went into shock":

| Time | | | |
|---|---|---|---|
| 0915 | Offender gave  approx 5 cc very dark tea colored urine. UA dip stick done. | | ML |
| | SPEC GRAVITY UR 1.030 [H] GLUCOSE neg KETONES URINE mod 40 [A] LEUKOCYTE ESTER trace [A] NITRITE URINE neg PH URINE 5.0 [L] PROTEIN URINE 30 + [A] BILIRUBIN URINE large [A] BLOOD URINE neg UROBILINOGEN UR 1.0 Offender given a 2nd pitcher of water c/o being cold blanket provided | *She gave me ice water which put me into shock. They then rushed me into the ER, and put blankets over me. F.F.* /@ appx 9:05am | |
| 0930 | EKG done  x's 2  #1  sinus rhythm with sinus arrhythmia rate 67  #2  sinus brady rate 56 | | *abnormally low pulse. Sign of impending death.* |
| 1000 | Offender resting quietly on ER bed. This writer awaiting arrival of provider for assessment and further orders | | ML |
| 1100 | Pierson here  orders noted IV started  open wide for 500 cc bolus see below | | ML |
| 1145 | IV rate decreased to 250cc/hr | | ML |
| 1200 | Offender c/o needs to void but is unable to. States he has had this problem before.. Orders noted In & Out cath performed with 900 ccs clear light yellow urine obtained | | |

Dkt. #283-21, pg. 755. Accordingly, Fountain's claim the "sudden internal and external temperature change from one extreme to another caused" him to go into shock constitutes a self-diagnosis not supported by the competent summary judgment evidence. Fountain's mid-August 2013 "emergency" visit does not show that he suffered from a heat-related illness.

Likewise, records of Fountain's July 26, 2014, medical visit do not show that he suffered from heat-related illness. The evidence shows that on July 26, 2014, Fountain presented at the medical department with complaints of dizziness and that he blacked-out due to the heat and lack of water, (Dkt. #283-23, pg. 901). After performing an evaluation, medical officials instructed Fountain on the importance of water intake and released him back to his cell. This record does not show that anyone acted with deliberate indifference to Fountian's health and safety; instead, the evidence demonstrates that he was evaluated and treated.

Fountain repeatedly asserts that he suffered from vast amounts of heat lesions. The medical records do not support these contentions. On August 29, 2014, Fountain complained of a rash and stated to medical officials that he believed it was heat rash, (Dkt. #283-23, pg. 978). Medical personnel observed and documented that Fountain had a "warty lesion on left heel," along with "scattered papules on back and abdomen" and "open legions from scratching"—diagnosing him with plantar wart and dermatitis. *Id*. They applied solution to the wart and prescribed triamcinolone cream and Periactin. *Id*. However, once again, Fountain provides nothing but his own self-serving diagnoses:

Today's Problem:  F/U wart treatment. Rash/Open sores. SCR 08/22/2014
08/29/2014 15:00

*lesions*

S: States that he has had a rash on his back, abdomen and feet for several weeks. States that he thinks it's a heat rash. States that he scratches a lot and that causes open sores.

O: Warty lesion on left heel. Scattered papules on back and abdomen, has some open lesions from scratching

A: Plantar Wart, Dermatitis       *lesions*

*and from heat.*

Plan is as follows:
   1) Apply TCA to wart, consent signed
   2) Rx Triamcinolone cream and Periactin
   3) F/U 7 days wart treatment

Dkt. #284-1, pg. 7. Given the medical evidence showing warts/dermatitis, Fountain's self-diagnoses of heat lesions are insufficient. *See Aswegan v. Henry*, 49 F.3d 461, 465 (8th Cir. 1995) (a prisoner's self-diagnosis of a serious medical condition is insufficient without medical evidence verifying that the condition exists).

The September 2, 2015, medical record also fares no better. On September 2, 2015, medical staff was called to the L Wing, as Fountain was "on the floor of his cell," and officers explained that he was non-responsive. The record contains the following note: "however, when this writer got to P2 L-Wing, the patient was walking down the stairs with a Seg Officer on either side of him, ambulated from 3 row down to 1 row and sat on the stretcher to be transported to medical," (Dkt. #284-6, pg. 421). While being transported, Fountain stated that he could not urinate and lost too much weight. Medical staff contacted a provider, who ordered placement of a catheter, a check for urinary retention, nortriptyline, and scheduling for a follow-up for urinary retention. Medical staff provided additional details, and Fountain added his own handwritten notes:

| **Contact Provider** | | |
|---|---|---|
| Name of Provider Notified: | S Pierson FNP | Time: |

Provider Orders:
1) Order pm snack re: pt's BMI is 20
2) Have RN Maciel palpate the bladder and check for Urinary retention
3) May place in and out <u>catheter</u> to collect and measure urine ← *I was unable to urinate on my own, at all, F.F.*
4) D/C Nortriptyline
5) Have Sick Call CCA schedule the patient with a provider as a follow-up for Urinary Retention and to discuss a replacement for the Nortriptyline *Yet*
6) Patient may be released back to his cell ←

*Details of abnormal findings and ongoing assessment and care.*

| Orders obtained and read back/verified by: (Name) | Lynne M Smith LVN |
|---|---|

*They had me drink water and they administered an IV due to my severe dehydration —unmentioned. F.F.*

| Time | Nursing Notes | Initials |
|---|---|---|
| 12:00 | The patient c/o having "blacked out"  His vitals <u>are WNLs</u> with the exception of his heart rate which is/tachy at 118.  He is given a pitcher of water and asked to provide a urine specimen  *Due to dehydration* | lms |
| 12:10 | The patient is drinking water and informs this writer that he has had problems urinating for a little over a week.   The patient states that he will have to force the urine out and at times he is unable to get the stream to even start. | lms |
| 12:15 | Orthostatic vitals are taken and the results are as follows:<br>Lying: B/P 125/82 P 64   Sitting  B/P 132/95 P 85   Standing B/P 124/82 P 87 | lms |
| 12:45 | The patient informs this writer that he last ate at lunch today around 10 to 10:30.   He states that he ate a Hamburger and a Peanut butter sandwich.    His Blood Sugar is 90 | lms |
| 12:57 | The patient provides approx. 5cc of urine for the Urinalysis.   See continued charting below | lms |

VITAL SIGNS

Dkt. #284-6, pg. 424.

Ultimately, medical officials explained to Fountain after his examination and tests were completed "of the potential for the Nortriptyline to be the reason that he is having urinary retention," and medical officials then discontinued his prescription for it. *Id.* at pg. 426. Fountain became upset and asserted that the Nortriptyline was "the only medication that was helping his pain," as Tylenol and Ibuprofen—which he admitted he had in his possession—were ineffective. *Id.* He was released back to his cell.

Much like the August 14, 2013, and July 26, 2014, medical visits, this September 2015 visit does not show that Fountain suffered a heat-related illness. While Fountain repeatedly insists that he was dehydrated due to the heat and the intentional withholding of cold fluids, he presents nothing more than his self-diagnoses and conclusory allegations to support his claims. Consequently, he has failed to meet his burden. *See Grizzle v. McIntire*, 2022 WL 17818101, at *14 (N.D. Tex. Oct. 31, 2022) (highlighting that a prison official's failure to follow a prisoner's self-diagnosis does not constitute deliberate indifference). All of Fountain's claims regarding the heat should be dismissed.

Turning to Fountain's assertions regarding "freezing" temperatures, Fountain similarly failed to demonstrate deliberate indifference. His allegations of repeated hypothermia are self-diagnoses, unsupported by the evidence. As "evidence" of hypothermia, Fountain submits prison grievances wherein he claims he is at risk of hypothermia and pneumonia because Defendant Collum gave "instructions" to turn off the ventilation system, but provides no support whatsoever:

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

I am grieving Coffield ad-seg Major Michael Collom deliberately attempting to harm P2 seg inmates, myself included, and cause death of wards under his care by way of placing us at high risk of hypothermia and pneumonia which he is causing by creating extremely cold air temperatures inside of the P2 building seg cells. Specifically, he has issued an order forbidding security or maintenance from turning off the P2 building summer time ventilation system.

Dkt. #282-11, pg. 68. Fountain's speculative concern that he will contract hypothermia or pneumonia presents no constitutional question. *See, e.g.*, *United States v. Koons*, 455 F. Supp.3d 285, 292 (W.D. La. 2020) (explaining that general concerns or the fear of contracting an illness while in prison are insufficient grounds for any type of redress).

Fountain's claims about hot and cold temperatures are inherently contradictory. He asserts that he suffered from hypothermia from September 1, 2018, through September 14, 2018, (Exhibit 2081A). Weather records indicate that the temperature on September 1, 2018, at the Coffield Unit was a high of 90 degrees Fahrenheit and a low of 73 degrees.[1] Without evidence that this medical condition existed, this allegation is again nothing more than a self-diagnosis. *See, e.g.*, *Sterns v. Catoe*, 2019 WL 2720333, at *8 (E.D. Tex. May 31, 2019) ("Sterns offers no medical evidence that his chest pains were caused by the heat, particularly since he contends that the incident occurred at almost 9 p.m.").

While Fountain insists that he suffered from hypothermia for days, he also maintains that he suffered from heart problems, particularly tachycardia, at the exact same time from the heat. He logged in his personal charts that he had "tachycardia 24-7" and lesions on August 24, 2018—but also hypothermia:

---

[1] https://www.timeanddate.com/weather/@z-us-75884/historic?month=9&year=2018

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 / 20 / 18 | No | | | | | | | | See 1908A | | |
| 8 / 21 / 18 | No | | | | | | | | hyperThermia | ↓ | |
| 8 / 22 / 18 | No | | | | | | | | tachycardia 24-7 / lesions | | |
| 8 / 23 / 18 | No | | | | | | | | ↑ | ↑ | |
| 8 / 24 / 18 | No | | | | | | | | ↓ / hypertension | | ↘ |
| 8 / 25 / 18 | No | | | | | | | | tachycardia 24-7 | | |
| 8 / 26 / 18 | No | | | | | | | | ↑ | | |
| 8 / 27 / 18 | No | | | | | | | | lesions | | |
| 8 / 28 / 18 | No | | | | | | | | | | |
| 8 / 29 / 18 | No | | | | | | | | | ↓ | |
| 8 / 30 / 18 | No | | | | | | | | | | |
| 8 / 31 / 18 | No | | | | | | | ↓ | | ↓ severe pain | ↓ |

*See* Exhibit 2081A, pg. 5. The outside temperature at the Coffield Unit on August 24, 2018, was recorded at 97 degrees as the high, with 82 degrees as the low.[2] Fountain essentially maintains that he suffered from both heat-illnesses and hypothermia at the same time. Such claim is inherently contradictory—and this Court is not required to accept absurd allegations and scenarios. Because Fountain has failed to demonstrate that any Defendant acted with deliberate indifference to his health and safety through extreme temperatures, these claims should be dismissed.

### f. Unsanitary Prison and Cell Conditions

Fountain contends that Defendants violated his rights through subjecting him to "filthy" cell conditions. He argues that the Defendants "maliciously promoted all such insects and infestations." *Id*. at pg. 8. He further maintains that while prisoners are given "Bippy" to use to clean their cells, "Bippy" is insufficient and not a chemical, (Dkt. #301, pg. 7).

A review of the evidence demonstrates that Fountain's various claims regarding sanitation and cleanliness do not present a constitutional violation—as he presents no extreme deprivation. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (holding that "extreme deprivations are required to make out a conditions-of-confinement claim."). A prison should be reasonably clean, but the Constitution "does not require that prisons be completely sanitized or as clean or free from potential health hazards as one's home might be." *McAllister v. Strain*, 2009 WL 5178316, at *3

---

[2] https://www.timeanddate.com/weather/@z-us-75861/historic?month=8&year=2018

(E.D. La. Dec. 23, 2009) (internal citation omitted); *see also Daigre v. Maggio*, 719 F.2d 1310, 1312 (5th Cir. 1983) (finding the denial of soap and towels was neither cruel nor inhumane because "some measure of hygiene [was] provided for prisoners in isolation, for their cells have running water. Moreover, the record does not establish that Daigre's isolation cell is generally unsanitary or that while in isolation Daigre was forced by the denial of utensils to eat with his hands."). Fountain admits that his cell had a sink and that he was provided towels and soap. *See* Dkt. #276, pg. 358 (Fountain highlighting that TDCJ usually provided towels and bars of soap).

Here, the record demonstrates that prison officials provide prisoners—including those placed in restrictive housing like Fountain—cleaning supplies once per week. Specifically, McNeil outlines the procedures as follows:

> Inmates in restrictive housing are provided cleaning supplies once a week. Inmates are provided a cleaning agent known as "Bippy." Bippy is not a chemical, as chemicals can be a security threat and used as a weapon. However, Bippy is sufficient to clean and disinfect cells. If there is sewage [is] in the cell, the inmate is pulled out of his cell and the janitor will clean. Every time an inmate is transferred to another cell, the cell is cleaned by staff and inmate janitors. Each inmate is provided a towel for their cell (in addition to their shower towel) to clean. Extra cleaning material such as extra Bippy and cleaning towel can be provided by simply asking an officer assigned on the run or writing an Inmate Request to an Official ("I-60").

> Inmates in restrictive housing receive laundry and hair care services and are issued clothing, bedding, and linen on the same basis as offenders in general population, except when an imminent threat to the safety of the offender or others exists. Restrictive housing inmates shall be observed daily for healthy and adaptive behavior. If an inmate goes a while without showering and the inmate's cell is not clean or if there are any other signs of mental health issues, the security staff will report the inmate to the psychiatric personnel.

Dkt. #251, pg. 53-54. Fountain does not dispute McNeil's assertion that prisoners are supplied "Bippy" as a cleaning supply—but, instead, complains that it is not effective. *See* Dkt. #276, pg. 358) (Fountain describing the "Bippy" as an inadequate cleaning agent provided by TDCJ). But he provides no evidence other than his own self-serving assertions that the Bippy was "useless." Fountain's claims that cleaning supplies are inadequate are wholly without merit. *See McAllister*,

2009 WL 5178316, at *3; *see also Tallmore v. Hebert*, 2008 WL 2597939, at *3 (W.D. La. May 28, 2008) ("There is simply no constitutional requirement that any specific type of disinfectant be used by prison officials.").

Fountain admits that Defendants provide prisoners placed in restrictive housing, including himself, weekly toiletries. Fountain states that "one roll of toilet paper, five small bars of hand soap, and one level tablespoon of powdered Bippy" were delivered to cells "every Thursday night, 2011 through 2020, at or around midnight," (Dkt. #276, pg. 424) (response to motion for summary judgment). Given that he admits Defendants provided such toiletries on a weekly basis, he cannot show that he was deprived of life's necessities.

With respect to insect infestations, Fountain provides no support showing that Defendants "maliciously promoted all such insects [sic] infestations," (Dkt. #95, pg. 8) (amended complaint). The mere presence of pests and critters does not violate the Constitution. *See Waller La. v. Ward*, 2016 WL 7235832, at *3 (W.D. La. Oct. 19, 2016) ("However, the mere presence of pests does not amount to a constitutional violation."). Given that TDCJ implements pest control at the Coffield Unit, Fountain cannot demonstrate deliberate indifference:

Give reason for appeal (Be Specific).    I am dissatisfied with the response at Step 1 because...

I am appealing Step 1 # 2017034456, returned to me (processed by Defendants Coleman and Richardson) on 12-22-16. The response is a strait flat out lie as usual. They never sprayed at all on or after that date 11-8-16. The spray they used the one and only time they sprayed a month or two prior wasn't even insecticide It was water or deisel Just for show. This is just another reason why yall are intentionally destroying all the on wing video Surveilance footage

Long as yalls records show nothing wrong, yall are good - right. Yea, well, we will see about that you evil people you. And still have ants spiders and roaches every where back here. Just as intended - right.

Dkt. #264-2, pg. 164. Fountain readily admits that spray is used, but simply complains in a conclusory fashion about the type of insecticide used and the destruction of alleged footage.

Furthermore, the evidence indicates that prison officials investigated Fountain's complaints of insects and explained to him the dates on which pest control was used on the Unit:

```
*** Comments From: GMC4572 - MCKNIGHT, GIDGET A.; 02/14/17 09:42am
PEST CONTROL TREATED THAT AREA ON JANUARY 17 & 18, 2017 AND WILL RETURN
TO TREAT THAT AREA AGAIN IN MARCH.

Sent to: LPA7630          PARKER, LORIE          (to)
* * *      End of Message      * * *
```

- Pest Control - is there today - S.Stewart, R3k Mana. Alt. 3/13/17 by

```
COMMANDS: Ans TRa Read DEFer FIle POst EDit DEL PUT QUE DCal Print Help Ed
```

Dkt. #264-2, pg. 182. While there is no evidence that prison officials at the Coffield Unit are not adhering to pest control policies, there is evidence that pest control was employed on the Unit— thereby rebutting Fountain's claim of deliberate indifference. *See Shakka v. Smith*, 71 F.3d 162, 167-68 (4th Cir. 1995) (finding no Eighth Amendment injury when prisoner was given water and cleaning supplies but denied a shower for three days after having human excrement thrown on him). Fountain's dissatisfaction with the type of pest control used does not offend the Constitution.

Finally, Fountain wholly fails to connect the alleged filthy and infested cells with an injury. He does not articulate a specific injury caused by the alleged insects or the "filthy" cell. He, instead, states that the insects "imposed a serious and imminent threat to his wellbeing," (Dkt. #276, pg. 362). Both speculation of future illnesses and self-diagnoses do not establish deliberate indifference.

Fountain failed to show "an egregious deprivation of a minimal life necessity that was so base or inhumane as to give rise to a constitutional violation." *Conlin v. Thaler*, 347 F. App'x 983,

984 (5th Cir. 2009). Prison is not designed to provide prisoners with comfortable amenities and services mirroring a hotel; it is well-settled that prisoners are not entitled to a rose garden or a stress-free environment inside prison. *See Wilson v. Lynaugh*, 878 F.2d 846, 849 n.5 (5th Cir. 1989) (citing *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988) (holding that while the "society they once abused is obligated to provide constitutionally adequate confinement," "[i]nmates cannot expect the amenities, conveniences and services of a good hotel.")); *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) ("Furthermore, cleaning supplies were made available to Davis, mitigating any intolerable conditions."). Because the Constitution does not afford protection against mere discomfort, annoyance, and inconvenience, all of Fountain's claims regarding filthy, unsanitary, and contaminated cells should be dismissed with prejudice. *See Alexander v. Sutterfield*, 2021 WL 2416973, at *2 (N.D. Tex. June 14, 2021) ("Simply put, the Constitution does not afford protection against mere discomfort or convenience.").

### 3. Placement in Administrative Segregation/Restrictive Housing

Fountain complains at length about his placement in restrictive housing or "administrative segregation." He specifically asserts that the cell in restrictive housing is akin to a "sensory deprivation chamber," and that he was placed there solely for punitive reasons for 3,137 days, (Dkt. #276, pg. 281). He argues that prison officials imposed the cell upon him based on "false, fabricated, and illegitimate disciplinary cases." Fountain states the following:

> Both an unlawful[] unit practice impl[emented], allowed, and carried out by defendants 1, 2, and 4, as well as malicious acts towards Fountain by the same defendants, these defendants did knowingly, deliberately, and maliciously hold, or allow Fountain to have been held in his small, filthy, dark, isolation cell with no light (light bulb denied) from a few weeks to as long as 50 consecutive days at a time "repeatedly" over the long course of six years in question, denying him of the basic human need of light, while intending cruelty and further psychological harm, to which both occurred.

Dkt. #95, pg. 17 (amended complaint). Fountain maintains that other cells within administrative segregation inside other TDCJ prisons have running hot water, access to a television, books, direct sunlight, daily showers, eating utensils and cups with meals and foods required by policy, and clean/safe living environments. *Id*. Fountain contends that he was housed in a sensory deprivation chamber, as "regular contact with other human beings" was nonexistent. *Id*. at pg. 20.

Citing the Universal Declaration of Human Rights, Fountain asserts that he was tortured. He contends that the restrictive cell was too narrow and therefore did not provide enough space for him to walk around inside, (Dkt. #276, pg. 299). He laments that he was not provided adequate recreation, thereby creating an increased risk for blood clots and a stroke. *Id*. at pg. 301. Fountain alleges that he suffered from bed sores in July/August 2019 because conditions forced him to sit or lie in the same general positions. *Id*. at pg. 302.

Fountain maintains that he was deprived of "positive physical sensation" for nearly a decade—and remained without access to the news or world events. He also claims that his cell was without basic furnishings, and because he "had written by hand upwards of one million or more words in his tenacious attempts to bring redress and correction to those conditions which he and his fellow men faced," he therefore experienced physical pain stemming from sitting on the floor. *Id*. at pg. 308. In response to Defendants motion for summary judgment, Fountain alleges that the lack of a television inside his cell—coupled with the lack of a radio, library books, and lighting— constituted an "extreme deprivation" prohibited by the Constitution, (Dkt. #301, pg. 13).

As for sunlight, Fountain contends that "the imposition of darkness" and denial of access to direct sunlight "quite possibly constituted one of the most inhumane and immoral conditions ever inflicted on Fountain by the Defendants and State," (Dkt. #276, pg. 315). The lack of natural sunlight, he insists, caused him vitamin deficiency, blackened and sunken eyes, dry and cracked

skin, eczema, and emotional pain. Fountain alleges that Defendants deliberately withheld lightbulbs. *Id*. at pg. 320. He states that he was without a lightbulb inside his cell for five consecutive days in 2015, several weeks in 2016, and then seventy-five days. *See* Dkt. #276, pg. 337-339. While lightbulbs were accessible through commissary, Fountain asserts that he was indigent and could not afford one.

Fountain failed to demonstrate that his placement in restrictive housing constituted a constitutional violation. He has not shown a protectable liberty interest—and, even if Fountain had, the record shows that he received all the due process that he was entitled to.

First, as Defendants maintain, prisoners generally have no protected liberty interested in their housing assignments. Prison systems have broad discretion in the classification of prisoners— and federal courts will not interfere with classification decisions absent extraordinary circumstances. *See Poree v. Akwitti*, 834 F. App'x 934, 935 (5th Cir. 2021); *Jackson v. Cain*, 864 F.2d 1235 (5th Cir. 1989); *Wilson v. Budney*, 976 F.2d 957, 958 (5th Cir. 1992). Therefore, to the extent Fountain complains about—and disagrees with—his prison classification, such claims fail.

In this vein, a prisoner's placement in administrative segregation absent extraordinary circumstances is an incident to the ordinary life as a prisoner, and therefore will "never be a ground for a constitutional claim." *See Pichardo v. Kinker*, 73 F.3d 612, 612 (5th Cir. 1996). As the Fifth Circuit stated, "[s]olitary confinement is typically viewed as an ordinary, expected, and permissible incident of prison life." *Bailey v. Fisher*, 647 F. App'x 472, 474 (5th Cir. 2016). Assignment to administrative segregation can implicate a liberty interest, however, when it is utilized such that it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Wilkerson v. Goodwin*, 774 F.3d 845, 853 (5th Cir. 2014); *see also Tate v. Starks*, 44 F. App'x 720, 732-24 (5th Cir. 2011) (noting that extremely restrictive

conditions constitute a "crucial exception to the general rule that a prisoner has no liberty interest in his classification.").

The Supreme Court has identified three relevant factors when examining the question of whether confinement in segregation is "atypical and significant": (1) the severity of the confinement restrictions; (2) the duration of the confinement in segregation; and (3) whether assignment to segregation has any collateral consequences on the prisoner's sentence. *See Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005); *Bailey v. Fisher*, 647 F. App'x 472, 475-76 (5th Cir. 2016). Courts have recognized that the severity of restrictions and duration as the two significant or key factors. *Wilkerson*, 774 F.3d at 854; *see also Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th 2013) ("In assessing whether disciplinary segregation amounts to a constitutional violation, this court looks to 'the combined import of the duration of the segregative confinement and the conditions endured.'").

In *Wilkinson*, the Supreme Court held that a prisoner's assignment to the Ohio Supermax facility entailed "highly restrictive conditions" of confinement, which gave rise to a liberty interest. 545 U.S. at 213. The Court highlighted that the Ohio Supermax—a maximum-security prison designed specifically to segregate the most dangerous prisoners from the general prison population—implemented more restrictive conditions than any other form of incarceration within Ohio, including conditions on its death row. *Id.* at 214.

The Court explained that "almost every aspect of an inmate's life is controlled and monitored" inside the facility, and cells within Ohio Supermax are 7 by 14 feet, and prisoners are confined inside their cells for 23 hours per day. *Id.* A light remains on inside the cell, "though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline." *Id.* The cells have solid metal doors with metal strips along the sides and bottoms to

prevent communication and conversation with other prisoners. Prisoners receive their meals in their cell as opposed to a "common eating area," and "[o]pportunities for visitation are rare and in all events are conducted through glass walls." *Id*. at pg. 214.

Moreover, during the one hour a prisoner is permitted to leave his cell, "access is limited to one of two indoor recreational cells." *Wilkinson*, 545 U.S. at 214. Placement at the Ohio Supermax is for an indefinite period of time—limited only by a prisoner's sentence, as for "an inmate serving a life sentence, there is no indication how long he may be incarcerated" at the prison once assigned there. *Id*. Parole-eligible prisoners lose their eligibility while incarcerated there. *Id*.

In finding that prisoners had a liberty interest in avoiding placement at the facility, the Court considered the totality of the circumstances imposed if assigned there—particularly focusing on the "severe limitations on all human contact," a prisoner's indefinite duration, and the disqualification of parole consideration if assigned there. *Id*. at 224 ("While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context.").

The Fifth Circuit visited this issue in *Wilkerson v. Goodwin*. 774 F.3d 845 (5th Cir. 2014). *Wilkerson* concerned a prisoner housed in solitary confinement for nearly thirty-nine years at Louisiana Penitentiary Angola (LSP). *Id*. at 848. The court highlighted the restrictive nature of confinement in segregation at LSP: confinement inside a cell alone for 23 hours per day, time for recreation and showers limited to one hour per day in isolated areas, significant limitations on human contact, and indefinite placement. *Id*. at 855. Considering the totality of the circumstances of the confinement, the Fifth Circuit held that the conditions were sufficiently severe to give rise to a liberty interest. *Id*. ("Here, however, we consider the 23-hour-a-day in cell isolation, limited physical exercise, and limited human contact, together with the extraordinary length of time . . . .

collectively, there can be no doubt that these conditions are sufficiently severe to give rise to a liberty interest.").

Recently, in terms of duration, the Fifth Circuit held that there is no threshold for atypicality. *See Carmouche v. Hooper*, 77 F.4th 362, 366 (5th Cir. 2023). The court essentially held that an analysis for atypicality varies, stating that "[d]istrict courts should apply a nuanced analysis looking at length and conditions of confinement on a case-by-case basis to determine whether they give rise to a liberty interest—not the application of a 30-month threshold."). *Id*. at 367; *see also Bailey*, 647 F. App'x at 476 (explaining that courts employ a "sliding scale").

### a. Severity of Restrictive Confinement

First, the nature or severity of Fountain's confinement in administrative segregation at the Coffield Unit was not "atypical and significant" giving rise to a liberty interest. As explained, his claims concerning sanitation, cleanliness, and insects do not demonstrate a constitutional violation. Simply put, the Constitution does not mandate the comfortable environment Fountain seeks. *See Talib v. Gilley*, 138 F.3d 211, 215 ("Courts repeatedly remind prisoners that the Constitution does not mandate prisons with comfortable surroundings or commodious conditions.").

Fountain has no constitutional right to a television inside his cell and, contrary to his contentions, he has not shown any "extraordinary circumstances" such that a television inside his cell would be constitutionally required. A television is not a life necessity. *See Scheanette v. Dretke*, 199 F. App'x 336, 337 (5th Cir. 2006). Contrary to his contentions, moreover, the evidence illustrates that Fountain accessed the library—as he specifically states that he received requested books from the Unit's law library. *See* Exhibit 95A (Prison grievance  in which he complains that he turned in his library book early in February 2015 and that he has to "grieve" to get his requested books); Exhibit 99A. His claim that he was denied reading material is belied by the record.

62

Equally refuted, the record further shows that Fountain was provided and offered recreation time. *See* Exhibit 1513A; 1645A (December 2017 grievance wherein Fountain complains that he is not allowed to choose whom he may recreate with in the dayrooms); Exhibit 3039A (daily logs wherein Fountain specifies prison officials escorting him to recreation in 2019 and 2020). Fountain has provided no evidence whatsoever that he was denied recreation. Similarly, given his lengthy litigation history that includes an exorbitant number of pleadings, handwritten exhibits and drawings, and letters in this case alone, it is clear that Fountain possessed a writing surface. The record further establishes that Fountain was able to communicate with other prisoners, which fails to show that he was deprived of human contact.

Turning to Fountain's claim that he was deprived natural sunlight for years, he fails to demonstrate that he was denied sunlight. In November 2015, after submitting a sick-call request, mental health officials visited Fountain at his cell. During the visit, Fountain explained that he was having trouble concentrating, reading, and sleeping. He also claimed that he did not have a light bulb in his cell. The official explained that "not having a light and having his cell front completely covered could be a large part of the problem," further speaking with him about coping skills and notifying security that he was without a lightbulb. *See* Dkt. #254-1, pg. 80. Fountain insists that this record was fabricated but fails to provide evidence of fabrication. Labeling a record as "falsified" is not evidence of that alleged falsification.

Fountain also submitted records of disciplinary cases in which he was found guilty of covering his cell front. Records indicate that in December 2011 and January 2013, Fountain was found guilty of covering his cell front with clothes. *See* Exhibit 4277A. Given evidence of Fountain covering his cell front to block light, he has not demonstrated that was purposely denied sunlight. While Fountain asserts that all of these records were fabricated through a state-wide TDCJ

conspiracy to conceal prisoner deaths—he provides no evidence other than his conclusory allegations. Moreover, even if he had been denied direct sunlight, Fountain has not demonstrated a substantial risk of serious harm stemming from lack of sunlight. *See Price v. Johnson*, 2020 WL 1312400 (W.D. La. Feb. 26, 2020).

The evidence further indicates that when Fountain complained about the lack of a lightbulb inside his cell, prison officials investigated and provided him with a lightbulb. Fountain submits several records showing that prison officials replaced his lightbulb on more than one occasion. *See* Dkt. #276, pg. 524; Dkt. #254-1, pg. 77 (March 2012 and November 2015). Given the evidence that his lightbulb was replaced, Fountain failed to demonstrate that any Defendant acted with deliberate indifference:

| From | To | Number of Days without Light |
|------|------|------|
| 2/22/12 | 3/2/12 | 10 |
| 11/2/12 | 11/20/12 | 19 |
| 11/3/14 | 12/22/14 | 50 |
| 5/3/15 | 5/20/15 | 17 |
| 11/15/15 | 11/20/15 | 5.5 = app'x 6 |
| 9/3/16 | 9/29/16 | 27 |
| 6/8/18 | 8/21/18 | 75 |
| | | Total = +/- 204 days |

Dkt. #276-8, pg. 322. Fountain has not shown that the nature and severity of his confinement within administrative segregation was atypical: He was provided books and recreation. Fountain also failed to demonstrate that he was deprived of natural sunlight. The conditions of confinement elucidated in *Wilkinson* and *Wilkerson* are far harsher than the conditions under which Fountain was housed. Therefore, the Court determines that the nature of Fountain's placement in administrative segregation was not atypical and significant giving rise to a liberty interest.

### b. Duration of Placement in Restrictive Housing

Second, unlike *Wilkerson* and *Wilkinson*, Fountain was not placed in restrictive housing indefinitely. His classification status was reviewed routinely. An examination of all the circumstances surrounding Fountain's confinement—including his extensive disciplinary history while in segregation—the duration of his confinement did not present an atypical, significant deprivation or hardship. *See Carmouche v. Hooper*, 77 F.4th 362, 367 (5th Cir. 2023) (explaining that "[d]istrict courts should apply a nuanced analysis looking at the length and conditions of confinement on a case-by-case basis to determine whether they give rise to a liberty interest.").

Federal courts are particularly concerned with indefinite placement in restrictive housing. *See, e.g.*, *Wilkinson*, 545 U.S. at 224; *Wilkerson*, 774 F.3d at 856 (explaining that solitary confinement at the prison was "effectively indefinite" as a result of "rote repetition"). The question becomes whether the reason a prisoner has been placed in segregation can change—or, stated differently, if the prisoner "has substantial influence over his length of stay in restrictive housing." *See Hernandez v. Abbott*, 2021 WL 11721407, at *10 (E.D. Tex. July 28, 2021) (highlighting that the plaintiffs in *Wilkerson* were placed in restrictive housing for reasons that could never change: Their convictions of murdering a correctional officer and a fellow prisoner while in prison).

Defendants here submitted the April 2021 affidavit of John Werner, TDCJ Deputy Director of Support Operations. Werner outlined classification procedures, security detention processes, as well as Fountain's classification and disciplinary history since arrival at the Coffield Unit in 2011. *See* Dkt. ##252-53; 266-70 (Exhibit E, Parts 1-40). Werner explained the details and procedures of placement in administrative segregation, in relevant part:

> 'Administrative Segregation' is a non-punitive, maximum custody status involving separation of an offender from general population for the purposes of maintaining safety, security, and order among federal population offenders and correctional staff within the prison and the public. Administrative segregation is composed of three separate categories:

(1) Administrative Segregation/Security Detention, (2) Pre-Hearing Detention, and (3) Transient Status. An offender placed in Administrative Segregation/Security Detention requires separation from the general population due to being a current escape risk, a threat to the physical safety of other offenders or staff, including volunteers and contract employees, or a threat to the order and security of the prison, as evidenced by repetitive, serious disciplinary violations or due to identification as a confirmed member of a security threat group (STG). An offender is placed in pre-hearing detention (PHD) when charged with, or suspected of, a disciplinary violation and (a) the offender is a current escape risk, (b) the offender's presence in general population would create a threat to the physical safety of other offenders or staff, or (c) it is necessary to separate the offender from general population to maintain the integrity of the investigation. An offender is placed in transient status pending the outcome of an Offender Protection Investigation (OPI). Offenders who are placed in transient status pending the outcome of an OPI are considered to be in restrictive housing as their placement in this status is necessary to preserve the safe and secure operation of the facility. Offenders assigned to this restrictive housing category are generally placed in the same manner as offenders assigned to PHD.

(Dkt. #252-1, pg. id. #1541). According to Werner, the Unit Classification Committee (UCC) is responsible at the unit level for (1) reviewing newly-assigned prisoners, (2) determining custody designation assignments not including administrative segregation custody, (3) determining prisoners' cell-integration status, and (4) proffering recommendations to the State Classification Committee (SCC). *Id.*

Those recommendations to the SCC may include (1) the assignment of offenders to G1 custody, (2) decisions involving prisoners housed in administrative segregation, and (3) a prisoner's placement in or removal from safekeeping status. *Id.* The Administrative Segregation Committee (ASC) is also responsible for the functions at the unit level and conducts the initial due process hearings for a prisoner's assignment to segregation. *Id.* at pg. 1542. The Restrictive Housing Committee (RHC) also conducts "regular scheduled hearings, dependent upon the offender's administrative segregation level." *Id.* All decisions concerning assignment to and removal from segregation require final confirmation from the SCC—and prisoners placed in segregation "shall be reviewed every 7 days following initial placement for the first 60 days, and at least every 30 days thereafter." *Id.*

66

Werner further explained that security detention includes three levels: Level I, II, and III—which are assigned to a prisoner based on his behavior, (Dkt. #252-1, pg. 1542). The RHC and SCC have the authority to change a prisoner's assigned level, which are categorized as follows:

**Level I Security Detention (1A):**    Prisoners who generally maintain good behavior but require separation from general population prisoners. Prisoners assigned to this custody level may have a history of assaultive behavior, but the prisoner's behavior within the last 90 days is non-assaultive.

**Level II Security Detention (2A):**    Prisoners who may be chronic rule violators or have a recent history of in-prison assaultive or aggressive behavior which occurred within the last 90 days. This behavior is documented with a major disciplinary case.

**Level III Security Detention (3A):** Prisoners who have been charged with a major disciplinary case within the last 30 days. Prisoners assigned to this custody level have current behaviors which are assaultive or aggressive in nature, such as institutional violence, weapon possession, assault or attempted assault on staff or other prisoners, or fighting with or without a weapon.

(Dkt. #251-1, pg. id. #1542).

Turning to Fountain specifically, Werner attests that Fountain arrived at the Gurney Unit for intake on May 21, 2010. TDCJ transferred him to the Bradshaw Unit on June 9, 2010, for assignment. On February 10, 2011, Fountain was transferred to the Coffield Unit because of an OPI; the UCC recommended a unit transfer and Fountain was reassigned to the Coffield Unit. *Id*. During his imprisonment, Fountain filed eight OPIs. He committed at least 22 disciplinary infractions—eight of which were committed while he was placed in restrictive housing.

Werner crafted a chronological chart submitted by Defendants—beginning January 31, 2011—outlining Fountain's placement in administrative segregation until he was released from Security Detention on October 2, 2020, (Dkt. #252-1, pg. id. #1542-45). An independent review of the records confirms the chart's accuracy. Fountain's conclusory assertions that all of his prison records were fabricated or falsified do not create a dispute of material fact.

In January 2011, Fountain was involved in two separate physical altercations with other prisoners that were alleged or confirmed members of Security Threat Groups. He filed an Offender Protection Investigation (OPI) and, after an investigation, prison officials transferred him to the Coffield Unit, (Dkt. #253-3, pg. id. #1781; 1792) (Defendants' Exhibit E). Fountain was assigned to General Population, G4, at the Coffield Unit. A few months later, on June 21, 2011, Fountain filed another OPI stating that his life was "in danger from many blacks" because he is a white supremacist, (Dkt. #253-2, pg. id, #1768). He specifically requested placement in administrative segregation or protective custody. *Id.* After conducting an investigation, prison officials found no evidence to support Fountain's claims—and the UCC recommended that he remain in his current status as a G4 prisoner. *Id.* at pg. id. #1770.

The competent summary judgment evidence reveals that Fountain was placed in restrictive housing/administrative segregation in August 2012 after he (1) articulated specific threats to inflict harm upon an officer. Specifically, the records establish that Fountain sent a handwritten note to an officer stating his intention to harm or kill an officer from "outside his race":

```
ON 8-9-12 OFFENDER FOUNTAIN, FREDDIE # 1640115 WAS PLACED IN
PHD STATUS FOR A LEVEL 1 CODE 4.0 THREATENING TO INFLICT HARM ON
AN OFFICER. OFFENDER FOUNTAIN SENT A HAND WRITTEN LETTER TO UNIT
ADMINISTRATION STATING THAT HE HAD A WEAPON AND WAS GOING TO USE
IT TO INJURE OR KILL AN OFFICER OR OFFENDER OUTSIDE OF HIS RACE.
OFFENDER FOUNTAIN IS A WHITE OFFENDER. FURTHERMORE, DURING A CELL
SEARCH OF OFFENDER FOUNTAINS CELL TWO HOMEMADE WEAPONS WERE FOUND
HIDDEN UNDER THE TOILET AS WELL AS A HOMEMADE HANDCUFF KEY. THE
OFFENDER WILL ALSO BE CHARGED WITH A LEVEL 1 CODE 6.0 POSSESSION
OF A WEAPON. THE OFFENDERS PROPERTY WAS PACKED AND INVENTORIED BY
OFFICER D. WOOLDRIDGE. OFFENDER FOUNTAIN IS BEING PLACED IN PHD
STATUS AS A LEVEL 3A OFFENDER.
```

He was found to be in possession of two homemade knives and a handcuff key, (Dkt. #273, Exhibit E-41, pg. 305). Prison officials charged him with a disciplinary case, he was found guilty, and placed in administrative segregation, (Dkt. #252-4, pg. 142). He remained in administrative

segregation until October 2, 2020, upon his approval or placement into Cognitive Intervention Transition Program (CITP).

While Fountain was confined in restrictive housing for approximately eight years, the competent summary judgment evidence reveals that his placement was not indefinite. Unlike the prisoners in *Wilkerson*, Fountain's classification was consistently reviewed, (Dkt. #252-1, pg. 10-32). The summary judgment evidence reflects that Fountain was often promoted in segregation status after a period without disciplinary history—but then subsequently demoted for various disciplinary infractions, (Exhibit E-41, pg. 139, 82; 59; Dkt. #268-5, pg. id. #3743; Dkt. #268-2, pg. id. #3689; Dkt. #268-1, pg. id. #3676; Dkt. #267-3, pg. 3627). Fountain's classification promotions and demotions throughout his years in segregation illustrate that his continued placement was not based on "rote repetition" or the original reasons for assigning him to segregation—but, rather, his continued belligerent behavior. His placement was therefore not "indefinite," and the Court thus determines that the duration of Fountain's placement in segregation did not give rise to a protectable liberty interest.

To the extent Fountain disagrees with his various demotions because of his behavior, the Court first notes that mere disagreement with classification decisions does not present constitutional issues. Second, the summary judgment evidence is replete with evidence showing that prison officials' decisions to keep Fountain in segregation for those years were reasonable given his behavior.

Fountain began his time in restrictive housing after prison officials discovered homemade knives and a handcuff key inside his cell. The Court need not dwell on either the importance of safety and security inside a prison or officials' wide deference in classifying a prisoner as a necessary means of maintaining safety and security. *Wilkerson*, 774 F.3d at 852; *see Johnson v.*

69

*California*, 543 U.S. 499, 529 (2005) (Thomas, J., dissenting) ("[E]xperienced prison administrators, and not judges, are in the best position to supervise the daily operations of prisons across this country."); *Butler v. S. Porter*, 999 F.3d 287, 296 (5th Cir. 2021) ("Great deference is a[fforded] to prison officials in their determination of custodial status.").

But even after Fountain was placed in restrictive housing as a result of possessing weapons inside his cell, he continued to violate prison rules throughout 2012, 2013, 2014, 2015, 2016, 2017, and 2018. (Exhibit E).  Specifically, all while placed in restrictive housing because of his behavior, Fountain (1) violated rules concerning clothes inside his cell, i.e., hanging clothes in front of his window, (Exhibit E-41, pg. 300), (2) failed to comply with orders, (Exhibit E-41, pg. 289), (3) refused to comply with grooming standards, (Exhibit E-41, pg. 138), (4) possessed contraband numerous times, including razor blades, unauthorized stamps, a fishing line, and extra towels, (Exhibit E-41, pg. 249; 285), (5) threatened to inflict harm upon officers and himself more than once, (Exhibit E-41, pg. 43; 57; 100), and (6) burned unidentified objects in front of his cell, (Exhibit E-41, pg. 47).

It is well-settled that safety and institutional security are legitimate penological goals— and, necessarily, prison officials may take measures to preserve institution safety by placing and keeping a dangerous prisoner in restrictive housing such as administrative segregation. Federal courts are not to shackle the ability of prison officials to anticipate and address security problems. In the face of a consistently combative and recalcitrant prisoner, this Court will not second-guess prison officials' determinations regarding Fountain's housing classification. *See Arenas v. Calhoun*, 922 F.3d 616, 621 (5th Cir. 2019) ("Furthermore, officers should be accorded wide-ranging deference in the … execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.") (internal citation

and quotations omitted); *McCord v. Maggio*, 910 F.2d 1248, 1251 (5th Cir. 1990) (holding that record supported the Magistrate Judge's findings that "the decision to keep McCord in CCR was reasonably related to legitimate security objectives and was not an exaggerated response to security considerations.").

The evidence shows that Fountain was a high-risk prisoner even while in restrictive housing—and that he also submitted several OPI's during his time in segregation wherein he claimed that he was being threatened by other prisoners. The UCC launched investigations, all of which were unsubstantiated; one investigation in 2015 reveals that prison officials recommended that "no action be taken" because Fountain was already housed "in segregation with high security," (Dkt. #252-4, pg. id. #1656). Prison officials' determinations that Fountain should remain in segregation were reasonable and abundantly supported by the record.

The totality of circumstances surrounding the duration of Fountain's restrictive confinement—the lack of it being indefinite, routine classification reviews, and his filing of OPI's specifically requesting restrictive housing for his own safety—illustrate no extreme deprivations that offend the Constitution. Fountain's continued placement in restrictive housing, even for over eight years, was related to reasonable and legitimate penological interests in maintaining institutional safety and security. The duration of his confinement in administrative segregation does not give rise to a liberty interest.

### c. Collateral Consequences

The final factor when examining the question of whether Fountain's confinement was "atypical and significant" centers on is whether his assignment had any collateral consequences on his sentence. *See Bailey*, 647 F. App'x at 475. The Supreme Court in *Wilkinson* highlighted the fact that Ohio's Supermax facility disqualified an otherwise eligible prisoner from parole

consideration. 545 U.S. at 224. Here, Fountain gives no indication whether his placement in administrative segregation impacted his release date in any way. The absence of a negative impact on his sentence, however, is not fatal to his claim. *Wilkinson*, 774 F.3d at 855. Having determined that neither the restrictive nature nor the duration of his placement in restrictive housing give rise to a protected liberty interest, the Court does not focus on this factor.

### d. Due process

Even if Fountain had established a liberty interest in his placement in restrictive housing, he was provided the process he was due.  As explained, the summary judgment evidence reflects that Fountain was promoted in segregation status after a period without disciplinary history—but then subsequently demoted for various disciplinary infractions, (Exhibit E-41, pg. 139, 82; 59; Dkt. #268-5, pg. id. #3743; Dkt. #268-2, pg. id. #3689; Dkt. #268-1, pg. id. #3676; Dkt. #267-3, pg. 3627). The record also contains his classification reviews occurring between 2012 and 2018. Fountain does not address the adequacy of his classification reviews or his demotions in classification status—other than to allege that all the allegations and reasons for his placement were fabricated. The summary judgment evidence is rife with evidence that prison officials regularly reviewed Fountain's placement in restrictive housing, and Fountain offers nothing to show that the processes were inadequate or otherwise unconstitutional.

### 4. Indigent Mail

Finally, Fountain maintains that Defendants curtailed his speech with his daughters from 2013 to 2017 by implementing TDCJ Policy BP-03.91, which restricted supplies to only five, one-ounce letters per month rather than per week. He claims that he was unable to mail them drawings—thereby harming their relationship because they "assume that their father (Fountain) does not care about them," (Dkt. #95). Fountain contends that BP-03.91 violates *Guajarno v.*

*Estelle*, 568 F. Supp. 1354 (S.D. Tex. 1983). The relevant portion of the regulation reads as follows:

> Postage and stationary mail from indigent offenders may be secured through the warden's designee. Postage and stationery shall be made available at regular intervals to indigent offenders, including those in administrative segregation. Postage and stationery shall be furnished to an indigent offender for correspondence to any special correspondent listed in these rules and to any attorney or legal aid society. An indigent offender may use indigent postage to send five one-ounce domestic letters per month to general correspondents and five items per week to legal or special correspondents. An offender may send extra letters to general, legal, or special correspondents using indigent postage if requested for a legitimate reason and approved by the warden.

Exhibit J.

The constitutionality of BP-03.91 was previously addressed in *Dunham v. Wainwright*, 2017 WL 571515 (W.D. Tex. Feb. 13, 2017).  The district court found that the policy satisfied the factors under *Turner v. Safley*, 482 U.S. 78 (1987)—as it serves "the legitimate penological interests of controlling costs and hindering trafficking and trading." *Id*. at *4. Under *Turner*, the Supreme Court articulated four factors relevant in determining whether a prison regulation like BP-03.91, affecting a constitutional right while incarcerated, withstands constitutional challenge: (1) whether the regulation has a valid, rational connection to a legitimate governmental interest; (2) whether alternative means are open to inmates to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and (4) whether there are ready alternatives to the regulation. *Turney*, 482 U.S. at 89-91.

In dismissing the claim, the district court held that the plaintiff failed to demonstrate that BP-03.91 violated his First Amendment rights. Highlighting decreased costs, evidence showing that the policy reduces hoarding, trading, and waste, the district court specifically found that the policy satisfied the *Turner* factors. *Id*. at *4.   The Fifth Circuit affirmed the district court's judgment. *See Dunham v. Wainwright*, 13 F. App'x 334, 335 (5th Cir. 2018) ("Accordingly,

Dunham's conclusional allegations and unsubstantiated assertions that Policy 03.91 encroached on his First and Fourteenth Amendment rights does not create a fact issue on summary judgment.").

Here, likewise, Fountain has not met his burden in demonstrating that BP 03.91 violates his constitutional rights. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (explaining that the burden is on the prisoner to disprove the validity of a prison regulation). The policy provides that, as an indigent prisoner, Fountain could mail five letters a month to his children. He has not shown that this violates the Constitution under *Turner*; moreover, he failed to demonstrate that he was harmed by the policy—as his assumption that his children believe that he does not care about them is insufficient.

Fountain takes issue with the policy only allowing five letters per month—as he seeks an injunction permitting five letters per week. He insists that only allowing five letters per month violates *Guajardo* because he maintains that the Fifth Circuit ordered TDCJ to provide five letters per week. *Guajardo*, however, stands for no such proposition.  That case concerned a settlement agreement and a previous TDCJ policy in which prisoner mail was read by prison officials and could be numerically restricted to a list of ten people who had to be approved. *Guajardo*, 580 F.2d 748, 753 (5th Cir. 1978). BP-03.91 does not numerically limit the persons prisoners may send mail to. Contrary to Fountain's contentions, *Guajardo* does not provide that TDCJ must permit prisoners to send five letters per week. This claim is therefore without merit.

To the extent Fountain complains that prison officials inspect prison mail before it is sent, such claim fails. While a prison official's interference with a prisoner's mail may violate the prisoner's First Amendment rights, the Fifth Circuit has repeatedly recognized the legitimate penological need for prison officials to open, inspect, review, and occasionally censor outgoing

mail—particularly in light of the need for prison safety, security, order, and eliminating contraband. *See Busby v. Dretke*, 359 F.3d 708, 721 (5th Cir. 2004). Fountain has not shown that the regulation violates his rights in light of the recognized need for safety and security inside prison facilities—especially given his belligerent behavior inside restrictive housing.

Fountain is angered because he was allegedly not permitted to mail his daughters handwritten drawings, and he contends that a "butterfly" drawing was intercepted. Defendants explain that drawings on indigent supplies are not permitted. Under TDCJ rules, in accordance with BP-03.91 and Administrative Directive 14.09, the indigent mail/supply program was established to issue necessary and appropriate supplies for written correspondence—and drawings do not constitute "written correspondence":

1. Step 1 Grievance
2. Statement from G. Karriker, Unit Access to Courts Supervisor, dated 05/19/17: Per Access to Courts management and in accordance with BP-03.91, the Indigent Program was established to issue supplies which are necessary and appropriate for the processing of written correspondence. In addition, indigent offenders are not able to mail contraband photos through the indigent program. Offenders who attempt to mail out personal drawings receive the attached slip notifying them of this rule. The indigent program will mail out correspondence, nothing further.
3. BP-03.91 Policy: The TDCJ shall facilitate written contact between offenders and the offenders' families and friends. All incoming and outgoing correspondence, except as otherwise provided in this policy, is subject to delivery, inspection, and rejection in accordance with the following rules.
4. AD-14.09 Policy: Each TDCJ policy shall make available to offenders (including offenders in any custody level or on commissary restriction), supplies necessary and appropriate for processing written correspondence.

Dkt. #265-1, pg. id. #3346.

To the extent Fountain challenges the constitutionality of this policy under *Turner*, his challenge must fail. TDCJ has a legitimate penological justification for restricting prisoners from mailing handwritten drawings under the indigent program—and Fountain has failed to meet his burden on summary judgment. Jeania Pegoda, TDCJ Program Manager I—Access to Courts, provided an April 2021 affidavit explaining why prisoner drawings could be rejected:

> Correspondence containing only drawings with no actual written correspondence could be rejected for the following reasons: security concerns, such as the drawing being code for something gang related, to prevent indigent inmates from using the indigent mail process as a business by making money from the drawings, and/or if the correspondence was used on paper or stationery not issued through the indigent process it would be rejected.

Dkt. #256-5, pg. id. #2616. The summary judgment evidence reflects that Fountain's drawings were rejected as artwork rather than written communication, (Dkt. #265-1, pg. id. #3340).

However, the summary judgment evidence  shows that this policy prohibiting drawings has a valid, rational connection to a legitimate governmental interest in maintaining and ensuring prisoner safety, security, and order under *Turner*. Again, the evidence contains able support illustrating Fountain's misuse of the prison mail system with contraband: mailing correspondence to the courts for other prisoners, attempting to mail "used" paper for correspondence, and sending mail through other prisoners' names against prison rules. Evidence also shows that prison officials would confiscate various printed materials as contraband. Fountain has not presented any competent summary judgment evidence sufficient to overcome Defendants' motion—as his allegations that his disciplinary cases were fabricated or falsified are wholly insufficient.

Additionally, while Fountain insists that these drawings were "harmless," he provides no support for this contention.  Ms. Pagoda's affidavit highlighting the dangers of prisoner drawings through, for example, the use of gang symbols and codes—coupled with the prison's need for safety and security—confirms that the policy is reasonably related to legitimate penological goals. Fountain's failure to show that his drawings were "harmless" is also fatal to his claim.

Similarly, Fountain provides no competent evidence that any "butterfly" drawing was halted in the mail. This claim should therefore be dismissed, as Fountain has not met his burden. *See Overton*, 539 U.S. at 132 ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."); *Keys v. Torres*, 737 F. App'x 717, 719 (5th

Cir. 2019) (holding policy 03.91 constitutional on its face and reminding that "[t]he inmate has the burden of demonstrating that there is no rational relation to a legitimate penological interest.").

### 5. Injuries, Conspiracies, and Totality of Circumstances

Fountain states that the totality of the conditions in administrative segregation caused him depression, stress, spontaneous anger, antisocial thoughts, hopelessness, loss of happiness and inner peace, and severe long-term mental and emotional pain and suffering. On January 31, 2016, he suffered physical injuries through multiple, deep-tissue lacerations from a razor that were self-inflicted.

He further contends that "Coffield Unit mental health care staff" engaged in a "mass cover up" through the falsification of his mental health records, as staff "intended to mislead future fact finders who would one day review those MHC [mental health care] records." Fountain takes special issue with records noting that he "feigned symptoms for secondary gain" because he maintains that his mental health symptoms were valid, (Dkt. #301, pg. 6).

Fountain is essentially alleging a civil conspiracy—namely, that Defendants fabricated his mental health records to show that he was faking his symptoms for secondary gain. *See* Dkt. #301, pg. 6 ("For them to admit the validity of his expressed symptoms would have affirmed the unlawful conditions that were causing those symptoms."). In order to prove a civil conspiracy, Fountain must prove an actual deprivation of his constitutional rights. *Kerr v. Lyford*, 171 F.3d 330, 340 (5th Cir. 1999). To plead a conspiracy under section 1983, a plaintiff must allege facts that indicate: (1) an agreement between the private and public defendants to commit an illegal act, and (2) an actual deprivation of constitutional rights. *See Shine v. Jones*, 743 F. App'x 566, 568 (5th Cir. 2018); *Ross v. Madison Parish Corr. Facility*, 2023 WL 6289992, at *7 (W.D. La. Sept. 6, 2023).

Conclusory allegations of a conspiracy, absent allegations of its operative facts or reference to material facts, do not state a cause of action. *See Marts v. Hines*, 60 F.3d 134, 136 (5th Cir. 1995); *Lynch v. Cannatella*, 810 F.2d 1363, 1369-70 (5th Cir. 1987). Allegations based on unsupported inferences or the logic of post hoc ergo propter hoc (after this, so therefore because of this) similarly do not suffice. *See Ross*, 2023 WL 6289992, at *7 ("Charges as to such conspiracies must be based on substantial and affirmative assertions, and no more gossamer of web of conclusion or inference … trifles light as air … will suffice") (internal citation omitted); *see also Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) (noting that "the post hoc ergo propter hoc fallacy assumes causality from temporal sequence," which is a "false inference.")

Here, Fountain has provided nothing but conclusory assertions of a global conspiracy to fabricate all of his prison records, including his mental health records. They do not establish a constitutional violation. He does not provide any facts that would indicate that defendants are acting in concert with each other to violate his rights or falsify his medical records; similarly, he provides no facts suggesting anyone entered into an agreement to falsify his records. Nevertheless, the intra-corporate conspiracy doctrine bars Fountain's claims of a conspiracy—as the various Defendants in this case are employees of a single entity, TDCJ, that is incapable of conspiring with itself. *See Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994); *Collins v. Bruer*, 2012 WL 443010 (N.D. Tex. Jan. 23, 2012).

The Court carefully reviewed Fountain's extensive mental health records from his time in restrictive hosuing. The records demonstrate that prison officials routinely evaluated and monitored Fountain—wherein mental health officials consistently determined that Fountain was not displaying symptoms of a mental health disorder, (Dkt. #254, Exhibit F). Specifically, prison officials conducted psychological checks on Fountain, (Dkt. #254-1, pg. 41-57). The record is

includes with documentation showing that mental health officials at the Coffield Unit repeatedly evaluated Fountain. *Id*. at pg. 57-151. At no time did medical professionals diagnose Fountain with a mental health condition.

In fact, on multiple occasions, the competent summary judgment evidence shows that mental health officials determined that Fountain was feigning—or faking—mental health symptoms in order to obtain some advantage for himself. In just one of many examples contained in the evidence, a medical record dated September 22, 2014, reveals that a clinical PAI psychological assessment of Fountain determined that he attempts to portray himself in a psychological manner, his interest in therapy is low, and he resists change, (Dkt. #254-1, pg. 113-14). During his interview with the provider, Fountain stated that "the issues are not him and that the issues are due to not receiving what he deserves by security staff." *Id*. at pg. 111. Mental health services were not "indicated." *Id*. at pg. 112.

On August 6, 2014, mental health providers examined and evaluated Fountain. A provider noted Fountain's behavior as "demanding"—highlighting his requests for sleep medication, extra legal supplies, extra paper, treatment for his foot, weekly therapy visits, extra mail privileges, and "everything else fixed," (Dkt. #254-1, pg. 125). The provider specifically referenced Fountain's demanding and entitled behavior: "The offender presents with extreme entitlement behaviors as evidenced by his demands for non-policy treatment." *Id*.

Moreover, in a separate evaluation occurring in September 2015, Fountain read "a page and a half statement" to the medical provider—who noted that the statement did not "once mention any specific mental health symptom that he was allegedly experiencing"—about treatment in the free world, (Dkt. #254-1, pg. 93). When the provider explained that his stress and anger "could best be managed with counseling," Fountain terminated the session and began yelling expletives.

*Id.* at pg. 91. The provider also noted that Fountain became argumentative when asked questions—stating that his written statement he had read "should suffice." *Id.* The provider ultimately determined that no psychiatric services were needed and specifically highlighted that Fountain became angry "when his demands were not given into." *Id.*

Another mental health official who examined Fountain in October 2015 highlighted that his complaints of hallucinations were "vague and contrived," further specifying that Fountain has "a long history of exaggerating symptoms for secondary gain," (Dkt. #254-1, pg. 84). The provider determined that no intervention was indicated. Accordingly, the record does not support Fountain's contentions—as no medical provider diagnosed him with a mental health condition.

Fountain's self-diagnoses do not illustrate a constitutional violation. His assertions that he suffered from depression, anxiety, and many other psychiatric disorders are self-diagnoses because he provides no support that he suffered from these illnesses while imprisoned. Fountain further fails to link any named Defendant to a psychiatric condition stemming from his housing placement. Other than his conclusory allegations of self-diagnoses, he does not show that he suffered from a mental health condition; and, even if he did, the summary judgment evidence is complete with documentation that he was consistently evaluated by mental health officials, which would defeat any claim medical deliberate indifference. Any disagreement with the mental health officials' diagnoses, choice of treatment, or treatment policy is insufficient to demonstrate medical deliberate indifference. *See Blank v. Bell*, 634 F. App'x 445, 449 (5th Cir. 2016) ("Blank's allegation he should have been seen by a specialist amounts to disagreement with his course of medical treatment or negligence, which, again, is not actionable.").

6. Qualified Immunity

Finally, Defendants have invoked qualified immunity. They argue that there are no genuine issues of material fact as to any of Fountain's claims—and that the evidence illustrates that Defendants did not commit a constitutional violation.

The defense of qualified immunity protects government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 409 (5th Cir. 2009). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

Fountain has the burden to demonstrate that the defense of qualified immunity does not apply. *See Bryant v. Gillem*, 965 F.3d 387, 391 (5th Cir. 2020); *Cunningham v. Castloo*, 983 F.3d 185, 190-91 (5th Cir. 2022). Conclusory allegations are insufficient to overcome the defense. *Williams-Boldware v. Denton Cnty., Tex.*, 741 F.3d 635, 643-44 (5th Cir. 2014); *see also Edmiston v. Borrego*, 75 F.4th 551, 561 (5th Cir. 2023) (rejecting Plaintiffs' conclusory statement);

To demonstrate the inapplicability of the qualified immunity defense, the plaintiff must satisfy a two-prong test. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The first prong is whether "the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of [constitutional or] federal law." *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (citation omitted). The second is "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known."

*Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004) (citations omitted).  A court may consider the two-pronged inquiry in any order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, Fountain failed to meet his burden of overcoming the qualified immunity defense because he failed to present competent summary judgment evidence showing that the Defendants violated a clearly established constitutional right. *See Laviage v. Fite*, 47 F.3d 402, 405 (5th Cir. 2022). He has not shown that the defense is inapplicable; his response to Defendants' invocation of qualified immunity is nothing more than conclusory assertions and recitations of the legal elements, (Dkt. #276). As explained throughout this Report, however, conclusory allegations are insufficient. *See, e.g.*, *Decker v. Dunbar*, 358 F. App'x 509, 510-11 (5th Cir. 2009) ("Decker cannot satisfy these requirements with conclusory allegations of wrongdoing. Nevertheless, his filings are replete with conclusory statements without evidentiary support."). Because Fountain failed to illustrate that any named Defendant committed a constitutional violation, or that any reasonable prison official would have known that any of the conduct of Defendants was unlawful, Defendants are entitled to qualified immunity.

## VII. Conclusion

Defendants' motion for summary judgment should be granted, and Plaintiff Fountain's civil rights lawsuit should be dismissed with prejudice. Fountain demonstrated neither a dispute of material fact nor a constitutional violation. While Fountain submitted numerous self-serving documents he created during his imprisonment, they do not overcome Defendants' properly supported motion for summary judgment. *See, e.g.*, *Michaels v. Avitech, Inc.*, 202 F.3d 746, 754-55 (5th Cir. 2000) (explaining that "if the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free … to grant summary judgment."); *see*

*also* W. Shakespeare, *Macbeth*, Act V, scene 5 ("…it is a tale … full of sound and fury, signifying nothing.")

<u>RECOMMENDATION</u>

Accordingly, it is recommended that Defendants' motion for summary judgment, (Dkt. #251), be granted and that this case be dismissed with prejudice.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

So ORDERED and SIGNED this 9th day of January, 2024.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE